Hamlin v. Meadville.

M. M. HAMLIN, TREASURER OF OTOE COUNTY, PLAINTIFF IN ERROR, v. THOMAS C. MEADVILLE, DEFENDANT IN ERROR.

1. **Powers of County Commissioners:** County commissioners possess no powers except such as are expressly granted, or are incidentally necessary to carry such powers into effect.

2. **County Bonds:** Counties have no authority at common law to issue bonds. They are *quasi* corporations, mere governing agencies, charged with certain objects of necessary local administration.

3. ————: The power to issue commercial paper must be conferred by statute. And such power must be exercised in the manner prescribed; but if the authority to issue the bonds existed at the time of their issuance, a mere irregularity in its exercise will not invalidate the bonds.

4. ————: SUBMISSION TO A VOTE OF THE PEOPLE. Where the question of issuing bonds to *any* railroad company was submitted to the people of a county, but without accompanying the same by a proposition to levy a tax to meet the liability incurred; *Held*, that bonds issued in pursuance of such vote were void.

5. ————: ————: Where a vote of the people of a county authorized the county commissioners to *subscribe* for stock in a railroad company. *Held*, that such authority did not empower the commissioners to *donate* the bonds of the county to a railroad company.

ERROR from the district court of Otoe county. The cause was tried in that court in 1873, before MASON, CH. J., and a decree, enjoining the collection of a tax levied on the property of Meadville for the payment of certain bonds, entered. It was brought here by the treasurer of the county upon petition in error. GANTT, J., having been of counsel below, did not sit in the case.

*E. F. Warren*, for plaintiff in error.

*G. B. Scofield*, for defendant in error, argued the cause, upon a brief prepared by Judge Gantt, before his election as a judge of the supreme court.

I.   Under the constitution of our state among the powers delegated are those of levying taxes to defray the expenses of the government—and this includes all departments of the government, whether state or municipal; providing for the organizing and disciplining the militia, regulating the jurisdiction of the courts, and for the protection of the citizen in his life, liberty, reputation and property.   And to secure these objects and carry into effect and maintain the essential police affairs and regulations of the government, taxation is not only a delegated power, but it is an element of sovereignty. This is ordinary taxation which the citizen pays in return for the protection secured and guaranteed to him by law; but extraordinary taxation is a materially different thing, and the power to levy such tax under the constitution which reserves to the people *"all powers not herein delegated,"* cannot be exercised unless expressly granted.

Is such extraordinary power granted?   We find it is authorized to repel invasion, suppress insurrection, or to defend the state in time of war, and to defray extraordinary expenses the state may contract, not exceeding in the aggregate fifty thousand dollars.

Under the well settled principles of law, in support of which I need not cite authority, these express enumerated grants of extraordinary powers, for the execution of which taxation is an essential attribute, exclude the idea of the exercise of any other such powers, and they must be taken as a significant fact that no other such extraordinary taxation was granted or intended to be granted. And nowhere in the constitution is found the grant of power authorizing the legislature to provide by law for a county to loan its credit, to make *donation* of the property of a citizen, or levy any tax for such extraordinary purpose.   Hence, I submit that there being no such delegated power, it essentially follows that all legislative

acts authorizing such tax must be without authority and void.    If such law can be upheld as a rightful exercise of legislative power, then indeed the reserved rights of the citizen, as well as the guarantees of the constitution are all a myth.    *May v. Cincinnati*, 1 Ohio State, 273.

II.    The bonds issued and the tax sought to be taken in the case at bar, are without compensation—a pure *gift* or *donation*.    Can private property be taken without compensation for public use?    Can it be taken from one citizen without his consent and *donated* to another, or to any public use?    I think that every fundamental principle of justice forbids such taking of property, and that the functions of government, as applied in every age of civil government, are directly opposed to such system of legal robbery.

In an historical examination of the functions of government we find in the philosophy of government the first fundamental natural right is the right of life which commences before we are born, and that it is protected both by the natural and civil law; the second natural right is to hold and enjoy the fruits of our bodily and mental labor, and this natural right to own the fruits of our labor includes all the honest acquisitions of property.    It has been truly said by most profound jurists, that what a man obtains by the exertion of his own mind, or his own hand, or both combined, should be his *own;* and this historical examination discovers to us that man in the rudest state of nature was not without some notion of exclusive property.    It seems to me that this natural right of property was not only inherent, but was demanded by all the circumstances surrounding the enjoyment and protection of life, for without it no man could have claimed as his own the fruits of his labor.    The fruit plucked by him from the tree might have been snatched from him ere he had tasted it, and the bed he

had prepared to rest upon might have been taken from him ere he had laid his body upon it. Hence, the inevitable wants and common necessities of man in all ages demanded the enjoyment and protection of this natural right. 2 Kent Commentaries, 318. *Sweet v. Hurlburt*, 51 Barb., 318. And we find in our own constitution not only a recognition but also the positive declaration of these inherent rights of property, etc., and also of the necessity of an essential adherence to justice and the frequent recurrence to fundamental principles. These rules of government are only declaratory of the natural rights which have always existed as fundamental principles of law, and to the maintenance of which we find the functions of government have always been applied. These rules of the social union of mankind I think are not only sustained by an historical examination of the proper functions of government but are also supported by reason and the soundest philosophical principles.

But it is said that the right of eminent domain contravenes this natural right of property. It will not be doubted that in all well organized and established governments, from the earliest period of civil government, by reason of the necessities of mankind this right of eminent domain existed. No one will controvert the fact that the establishment of civil government and the progress to higher civilization required some modification in the use and enjoyment of property under this natural right. It became essential to the well-being of the social compact that property should not be used to the injury of others; that good order in the community demanded police regulations and the enforcement of municipal law, and therefore it became just and equitable that all members of the community should aid in the maintenance and execution of the rules of society—and hence it is not difficult to discover the origin of the

power of taxation for the support of government. But I presume a fair interpretation of the history of government shows that, until within a recent period, this power was only exerted for the general benefit of the whole state, and only as far as was necessary in the general police regulations of the government for the protection and common advantage of all persons in their social, commercial, agricultural and political relations. And in applying the functions of government to these objects, it is assumed that the tenure of property is derived from the governing power. But from the best historical light on this subject, it seems evident that this tenure was originally derived from occupancy or universal consent that man by virtue of his natural right should enjoy the fruit of his own labor. But however this may be, in the more recent history of governments the political theory seems to be adopted that this tenure is derived from the governing power. *West River Bridge v. Dix*, 6 How., 532. *Bloodgood v. Mohawk & Hudson R. R. Co.*, 18 Wend., 27. *Sharpless v. The Mayor of Philadelphia*, 21 Penn. State, 147.


MAXWELL, J.

On the sixteenth day of March, 1866, a special election was held in the county of Otoe for the purpose of determining whether Otoe county should issue its bonds in an amount not exceeding $200,000 for the purpose of securing an eastern railroad connection for Nebraska City. On a canvass of the votes it was found that 1362 were in favor of the proposition and 201 against it. At a meeting of the board of county commissioners of said county in November, 1866, it was ordered that $40,000 of the bonds voted in the preceding March be *donated* to the C. B. & St. Joseph R. R. Co., provided they would locate their road within one and a half miles

of the ferry landing at Nebraska City. In pursuance of this order $40,000 of the bonds of the county were delivered to the company. On the eighteenth day of February, 1871, the defendant in error instituted proceedings in the district court of Otoe county to enjoin the collection of taxes for the payment of interest on the bonds in question, and praying that said bonds may be declared null and void. Judgment was rendered in his favor in the court below, to reverse which the case is brought into this court by petition in error.

On the sixth day of January, 1860, the territorial legislature passed an act authorizing the board of county commissioners of Otoe county to submit to the people of that county the question whether Otoe county should *subscribe* for stock in an amount not exceeding $75,000 in any railroad company then or thereafter located in Fremont county, Iowa. The act provided that in case a majority of the legal voters of said county voted in favor of the proposition, the board of county commissioners of said county should issue the bonds of said county for whatever amount of stock it may have been decided upon by such vote.

On the eleventh day of January, 1861, an act was passed by the legislature authorizing county commissioners to submit to the people of their respective counties the question whether the county will aid or construct public buildings, the question whether the county will aid or construct any road or bridge, or submit to the people of the county any question involving an extraordinary outlay of money by the county. The act provided that the proposition of the question must be accompanied by a provision to levy a tax for the payment thereof in addition to the usual taxes, and no vote adopting the question proposed shall be valid unless it likewise adopt the amount of tax to be levied to meet the liability incurred.

The only question necessary to be considered is that of the *power* of the county commissioners to issue the bonds in question. The question whether the *territorial* legislature, under the organic act, had authority to authorize a county to issue its bonds for the purpose here indicated, has not been raised *directly*, either by the pleadings or argument, and will not be discussed.

The rule is well settled in this court that county commissioners can exercise only such powers as are expressly granted, or are incidentally necessary to carry into effect the powers granted. *The S. C. & P. R. R. Co. v. Washington Co.*, 3 Neb., 42. *Stewart v. Otoe Co.*, 2 Neb., 177. *The People v. Com'rs. Buffalo Co.*, 4 Neb., 150.

Whatever may be the rule as to municipal corporations, counties have no authority at common law to issue bonds. They are *quasi* corporations—mere governing agencies, charged with certain objects of necessary local administration. The power to issue commercial paper must be conferred by statute, and such power must be exercised in the manner prescribed, although it seems to be well settled that where the authority to issue the bonds existed a mere irregularity in its exercise will not invalidate the bonds in the hands of innocent purchasers for value. The authority, if any, given to the county commissioners by the vote of the people was to *subscribe* for stock in a railroad company. Under such authority can they make a *donation* of the bonds of the county to a railroad company?

The supreme court of the United States, in the case of the *C. B. & Q. R. R. Co. v. Otoe County*, 16 Wall., 667, held that there is no solid ground of distinction between a subscription to stock and a donation. In that case much stress is laid on an act of the legislature, approved February 15, 1869, section one of which provides "that said commissioners

(of Otoe county) be and they are hereby authorized to issue one hundred and fifty thousand dollars of the bonds aforesaid to the Burlington & Missouri River Railroad Company, or any other railroad company that will secure to Nebraska City a direct eastern railroad connection, as a donation to said railroad company, on such terms and conditions as may be imposed by said county commissioners."

The title of the act referred to is as follows: "An act to authorize the county commissioners of the county of Otoe to issue the bonds of said county, to the amount of one hundred and fifty thousand dollars, to the Burlington and Missouri River Railroad, or any other railroad running east from Nebraska City." The second section of the act provides that "said bonds, when so issued, are hereby declared to be *binding obligations on said county*, and to be governed by the terms and conditions of an act entitled 'an act to enable counties, cities, and precincts to borrow money or to issue bonds to aid in the construction or completion of works of internal improvement in this state, and to legalize bonds already issued for such purpose. Approved February, A.D. 1869.'"

The power of the legislature to legalize a *void* proceeding like this may be fairly questioned, but it was not the purpose of the act to legalize the bonds.

Section nineteen, article II, of the constitution of 1867, provided that no bill should contain more than one subject, which should be clearly expressed in the title. In *White v. The City of Lincoln*, 5 Neb., 516, it was held that it would be sufficient if the law had but *one general object*. The only purpose of this act as expressed in the title was to authorize the issue of the bonds. Under such a title the legislature could not (even if it had the power to do so) constitutionally legalize these bonds.

The supreme court of the United States has gone to a

Hamlin v. Meadville.

great length in sustaining municipal bonds, and there is apparently danger that the court will (if it has not already done so) overlook the fact that the taxpayers have rights. In *Marcy v. Township of Oswego*, 92 U. S. (2 Otto) Sup. Court, 637, it was held that bonds issued by a township in excess of the limit fixed by the statute were valid.

Where a *quasi* corporation, in pursuance of express authority, deliberately assumes a burden, by issuing its bonds for public purposes, good faith requires their payment. But bonds issued without authority, or in excess of the limit fixed by statute, are no more the bonds of the corporation than if they were forgeries. In the case at bar, so far as the record discloses, there was no submission to the people of the question of taxation for the payment of either the principal or interest of the bonds, as required by statute. The entire proceedings therefore were entirely void, and are not aided by the act of 1869. But if the authority to issue the bonds had existed, the commissioners had no authority under the vote of the people of the county to make a *donation* thereof to the railroad company. There is no presumption that the stock of a railroad company is of no value; but even if not very valuable the stockholder, to the extent of his stock, has a voice in the election of officers of the company and in the control of its affairs that may be of more value to his locality than the mere market value of the stock. As we see no error in the record, the judgment of the district court is affirmed.

JUDGMENT AFFIRMED.