STATE v. JAMES KNOTTS, JESSE HELMS, HIRAM SIKES, AND
WILL STAMEY.

(Filed 23 December, 1914.)

1. **Criminal Law—Indictment—Sufficiency—Interpretation of Statutes.**
   Under the provisions of Revisal, sec. 3254, a warrant or indictment, etc.,
   in criminal cases shall be sufficient in form if the charge against the
   prisoner is expressed therein in a plain, intelligible, and explicit manner,
   and they may not be quashed, or stay of judgment granted, by reason of
   any informality or refinement, if in the bill or proceeding sufficient matter
   appears to enable the court to proceed to judgment.

2. **Same—Duplicity—Motions to Quash.**
   A motion to quash an indictment for assault because of duplicity will
   be denied when it appears on the face of the indictment that though the
   assault is charged as being made on two or more persons, it was committed
   by one and the same act; the remedy of the defendant, if any is available,
   being by proper application to require the State to elect or, perhaps, to
   sever the prosecutions.

3. **Criminal Law — Intent—Deadly Weapon—Malice Presumed—Trials—Instructions.**
   From the intentional commission of a criminal offense, without just
   cause or excuse, the law will presume general malice, which will support
   a verdict of guilty; and upon trial for a secret assault with a deadly
   weapon it is not error for the judge to charge the jury that malice would
   be presumed from the use of the weapon, and immediately thereafter
   that malice would be presumed from the intentional use thereof.

4. **Criminal Law—Secret Assault—Common Design—Evidence—Trials.**
   On trial for a secret assault there was evidence tending to show that
   the several defendants were alone in the shadow of a deserted house in
   the night-time, and seeing two policemen approach, who were unaware of
   their presence, one of them said to the others, "Let us kill them." One
   of the policemen, using a flashlight to see his way along, flashed it in the
   face of one of the defendants, who fired upon him, and this was seen by
   the other policeman following, but not by the one who was then shot,
   whereupon the other defendants, excepting one, firing from the dark,
   inflicted injuries upon the other policeman. *Held,* the defendants being
   together and aiding and abetting each other in pursuance of an unlawful
   and common design, were each guilty of a secret assault upon the police-
   man first shot, who did not see his assailant; and this applies, also, to
   the defendant thus engaged, who did not have a pistol or use one, as he
   is considered as having participated in the assault. Revisal, sec. 3621.

5. **Criminal Law — Conspiracy—Inference—Circumstantial Evidence—Trials
   —Questions for Jury.**
   No direct proof of an agreement to enter into a conspiracy for an un-
   lawful purpose is necessary, for the conspiracy may be perfected by the
   union of the minds of the conspirators; and the fact of conspiracy may
   be established by an inference of the jury from other facts proved—that
   is, by circumstantial evidence.

**6. Criminal Law—Secret Assault—Common Design—Aider and Abettor— Evidence—Former Acts—Robbery.**

There was evidence tending to show that all the defendants charged with a secret assault upon two policemen were together on the night prior to the time, under suspicious circumstances, and afterwards held up, with pistols, some negro boys for the purpose of robbery, and that after the assault charged, one was active in looking after another one of them who had been shot. At the time of the assault this defendant was present with the others, but was unarmed and did not actively engage in the shooting which occurred. *Held,* the evidence tending to show a secret assault made by the other defendants was evidence against the one who was present but did not actively participate in the assault, and the evidence of the robbery was also competent against all the defendants upon the question of whether the design to commit the subsequent secret assault was common to them all.

**7. Criminal Law — Defendants' Character—Presumptions—Trials—Remarks of Counsel—Appeal and Error.**

Where the defendants in a criminal action have not testified as witnesses, it is correct for the trial judge to refuse to charge the jury, on their behalf, that the law presumed them to be men of good character; and where the prisoner's attorney in addressing the jury has urged upon them this erroneous proposition, it was not error to permit the solicitor, in reply, to argue that the defendants had not taken the witness stand and their attorney should not be permitted to claim that their character was good.

**8. Constitutional Law—Unusual Punishment—Secret Assault—Appeal and Error.**

The sentence of the court in this trial for secret assault is not objectionable as imposing an unusual or excessive punishment.

APPEAL by defendant from *Shaw, J.,* at August Term, 1914, of MECK- LENBURG.

The prisoners were indicted below for a secret assault on A. B. Moore and Neal Elliott, were convicted, sentenced to confinement in the State Prison for terms ranging from four to fifteen years, and have appealed from the judgment to this Court.

The indictment charged that the four prisoners jointly committed the assault with pistols upon Moore and Elliott, shooting both of them. The prisoners moved to quash the indictment, because it charged a secret assault by all the prisoners upon two persons named in the bill, Elliott and Moore. The motion was overruled.

Owing to the character of the other exceptions, it will be necessary to set forth the evidence somewhat at large.

Neal Elliott, witness for the State, testified: "I was assistant chief of police of Charlotte when I was shot, on the morning of 18 July, 1914. I have known the defendant Sikes for two or three years, Knotts for five years, Helms for four or five years, and Stamey for five years. I was on

duty that night. I had a call from Andy James. A. B. Moore and I went in an automobile to investigate the trouble. Call came about 12:30 a. m. Went on North Brevard Street, where it crosses S. A. L. Railway. Got there about 12:35 a. m. We hunted all over the neighborhood, but could not find the parties. We then crossed over the Norfolk Southern Railroad tracks, and approached the house in the angle between the Norfolk and Southern and Southern railways. This afterwards proved to be a vacant house, where the shooting occurred. Policeman Moore was in front of me about 5 feet, and had a flashlight, which he used in walking while we were approaching the house from the railroad fill, and flashed it in Sikes' face. (Witness here used a plat of the premises to explain his evidence.) Hiram Sikes said, 'Take that light out of my face,' and at once shot Moore down and shot at Moore two more times. I recognized Sikes by the flashlight in Moore's hands. I also recognized Will Stamey, who was standing by Sikes. I shot at them and they disappeared behind the end of the house, but ran around the house when the shooting began. Sikes and Stamey were to my left; at the same instant some one shot me from the right, 7 or 8 feet away. As I turned, Jim Knotts fired at me and struck me, and I shot at him. Helms then shot at me and I shot at him. I shot four times, and they disappeared around the east end of the house. I had no information that Knotts and Helms were there until they shot at me. They were shooting so fast that I could not tell how many times they shot. This house was an old, unoccupied house. The house was between the two railroad fills, the Norfolk and Southern and the Southern. I recognized Knotts when his pistol flashed, and I recognized Helms when his pistol flashed. It was about a minute from the time of Sikes' shooting till Knotts and Helms shot. I was shot here (indicating a point just above the heart), and it came out about that far (indicating to the jury) from my backbone. The defendants were in the rear of the vacant house, the porch of which faces towards the fill from which we approached. I never saw Stamey shoot. So far as I could observe, Stamey had nothing to do with the shooting. Just standing there. I had seen Sikes before he shot, while the flashlight was in his face. I recognized him. I recognized his voice when he said, 'Take that flashlight out of my face.' I saw Stamey standing by Sikes, and I recognized him before any shooting. Helms shot at me, but did not hit me. I don't know who shot at me first, whether Knotts or Helms. I turned and then Knotts shot at me. Helms was standing when he shot. I don't know about Moore firing. I fired the first shot after Sikes shot Moore down. Sikes only shot at Moore and not at me. I was shot down after Jim Knotts shot me. I saw Helms shoot at me. Lloyd Hipp was the first man who got to me. Bob Mal-

colm was the second one. I know Jule Freeman. I don't know whether he was there. The last thing I remember, they were taking me up the elevator at the hospital."

A. B. Moore, witness for the State, testified: "I was a policeman on the night of the shooting. In consequence of information received, Mr. Elliott and I went on North Brevard Street, near the S. A. L. Railway, looking for the parties reported by Andy James, who was supposed to be on the railroad, east of Brevard Street. We then went west and crossed the Norfolk and Southern Railway fill, when I saw the flash of a pistol and fell to the ground. I wasn't far from a house when I was shot. I had a flashlight, walking along with it. I did not see any one before I was shot. (Witness here describes the wound, indicating that same was in his chest above the heart and ranged downward, going through his body in the center of the back.) The ball was found in my shirt. I did not recognize who shot me. One shot was all that I knew of, but I was also shot through the thigh. I was unconscious after I was shot. I do not recollect shooting any myself, but my pistol, I found after I regained consciousness, had been discharged; every shell was empty. I said to Elliott, 'I am shot,' and he said, 'I am shot, too,' and walked up on the bank. I never saw any one there. I didn't hear any one say, 'Take the flashlight out of my face.' I was carrying the flashlight in front, using it to walk by. I do not know why I did not see Sikes. I do not know why I did not hear him say, 'Take the flashlight out of my face.' I cannot explain why Elliott, who was 5 feet behind me, could see Sikes and hear him when I did not. I do not remember shooting my pistol. It was a No. 38 pistol; all the cartridges in my pistol had been shot."

Lester Tucker, witness for the State, testified: "I am 20 years old. I have known Jim Knotts for fifteen years; Will Stamey for twelve years; Helms twelve or fourteen, and Sikes about twelve years. I live in North Charlotte with my father. Five blocks from my house is where the shooting took place. On that night before the shooting I saw all of the defendants on overhead bridge about 11:30. I saw pistol showing in the crowd. It was a .22 or a .32. I don't know who had it. Jim Knotts and Sikes were in the crowd. I heard the shooting. Then I dropped off to sleep. Soon Will Stamey came and waked me up. There was no one with him. He said a crowd over yonder had been shooting; said, 'Go over and see if the police got any of them.' We went to Seventeenth and Caldwell streets; saw Knotts, and I whistled to him. He came up and I asked him did they get any of them. He said, 'No, sir.' He said Hiram Sikes was shot. Knotts asked me to go with Stamey and get Sikes and bring him on down; called and whistled for Sikes, but could not find him. Knotts said to Stamey, 'Protect your-

selves with pistol if any one comes up.' The other two defendants I did not see till yesterday. I heard twelve or fifteen shots fired. I could tell difference in sounds of pistols. The first four or five shots sounded louder than the others. The other shots sounded like .22 or .32 pistols. The first shots sounded like a .38 or .44. Stamey told me he ran as the shooting began. Stamey was in his shirt sleeves and had no pistol."

Charlie Simpson, witness for the State, testified: "I lived at the time on Sixteenth Street; I know the night the shooting occurred. Saw Hiram Sikes Saturday morning, when wounded, about 10 o'clock. I saw him the night he was shot, about 2 o'clock a. m. He got to my house, called me; said come go a piece with him; 'I am shot,' he said; 'I got in shooting scrape.' I said, 'If I go with you, they might think I was in it.' And he said, 'Yes, you had better go back.' Sikes never said he shot anybody."

R. H. Moore, chief of police, witness for the State, testified: "I know defendants. I have known Helms one year and the others five or six years. On the morning after the shooting on 18 July, about 6 o'clock, defendant Helms was brought into my office. His clothing was wet with dew; a part of the legs of his trousers was wet. I asked him where he had been the night before; he said he had been with Knotts and the other defendants in company with some others at the Caldwell bridge. Said he (Knotts), Stamey, and Sikes all left this crowd then. I asked him when he left. He said between 1 and 2 o'clock. I asked about the shooting. He said the defendants were all at this old house, and that the officers crossed the Norfolk and Southern Railway and were approaching them. He said that as they were crossing the Norfolk and Southern Railway, Knotts said, 'Yonder come two of them G— d— policemen; let's kill them.' And he said that, when the officers got down to them, Sikes told one of the policemen to take the light out of his face, and shot. Knotts was next brought into my office. He stated that he and the other defendants were the four at the old house when the shooting occurred. He said that Stamey did not shoot. He said that the three did the shooting from this side. I said something to him about being in trouble. He said that he was not in any greater trouble than he could come out of. I asked Knotts if they knew whom they were shooting at. He said he thought at the time it was McKnight and Orr, other policemen. He said he had nothing against Elliott; that Elliott had been nice to him. I next had a conversation with the defendant Sikes. I told him that Helms and Knotts had made a statement, and that Knotts said he (Sikes) was there. Sikes said he was shot by a policeman; that he got into a shooting scrape and got shot. Sikes said that they came on in front of him, and one of them flashed his light in his face and he shot him. I next had a conversation with Stamey. He

168—12

said that he and the other defendants were there at the old house. He said that the officers came, and Knotts said, 'Let's kill them'; that the policemen were coming over the fill of the Norfolk and Southern, and one of them, approaching the house, flashed his light in the face of Sikes and Sikes shot; Stamey said that he had no pistol; said that he ran around the corner of the house after Knotts and Helms began shooting."

Andy James (colored), witness for the State, testified: "I remember the night of the shooting. Me and Haywood McCoy went to Policeman Johnston about 15 minutes after 12. Me and Haywood McCoy were coming from an entertainment at the corner of Brevard Street and the Seaboard Railroad. Knotts walked out and stopped us and asked where we were going, and drove us down the railroad with a pistol. No one was with him then. He drove me down about a box-car length further, and two other men ran out from behind the box car. I did not know them before they got around us. They commenced searching us and Knotts grabbed Haywood in the collar and Stamey felt of my pockets, and then Sikes threw pistol across my shoulder in Haywood's face, and the little fellow Stamey said, 'Let the niggers go on; they ain't got nothing.' I started on down the railroad; they still held Haywood there; then Helms came up the railroad cursing, and said, 'What are you doing here? If you haven't got nothing, you ought to have been going on.' I started on one side of the box car, started to run, and he shot. Bullets came over my shoulder."

On objection, the court instructed the jury that this evidence could only be considered by them as tending to show that the defendants were all acting together and in concert at the time the policemen were said to have been shot, and could be considered by the jury for no other purpose. Defendants excepted to this charge to the jury.

Andy James further testified: "I went to Huntley's store and waited for Haywood, and he brought my hat, and we went immediately to Policeman Johnston and told him, and he sent us to the police station. I then reported this to Chief Elliott, and he and Mr. Moore went out to hunt the men who had assaulted us, and we went with them to where the offense was committed, and the officers searched and could not find any one, and they then told me to go on home. We were not cursing white folks when they stopped us. Neither of them put their hands in our pockets. They did not demand money or property from us. They felt my pockets and found out I had nothing and had no pistol. One of them says something about a pistol while patting my pockets; they made us run down the railroad."

The prisoners duly objected to evidence of the statements of the prisoners, or any of them, made to the officers. The court instructed the

jury to consider these statements as evidence only against the particular one of the prisoners who made them, and not otherwise, if they found that, in fact, they were made.

After the introduction of the foregoing testimony the State rested its case. Each of the prisoners then moved to nonsuit the State, and particularly to nonsuit on the charge of secret assault, since there was a variance between the allegations and the proof offered· in the trial. Motion overruled. The prisoners offered no testimony, and no further testimony was introduced by the State. The prisoners objected that the solicitor had argued that there was no presumption that the defendants were men of good character, that there was a presumption of innocence as to each defendant until his guilt was established beyond a reasonable doubt. This was in reply to an argument of prisoners' counsel that the prisoners were men of good character and that there had been nothing shown against their character. The objection was overruled. The solicitor further argued, in reply to arguments of defendants' counsel that the defendants were men of good character and that there was nothing shown against their character, and stated that as the defendants had not gone on the stand, under the law they were not allowed to argue that the characters of the defendants were good. Prisoners objected to this course of argument, and were overruled. The prisoners jointly and severally reserved exceptions to all of their overruled motions and objections. At the close of the evidence, after moving to nonsuit, they prayed, in behalf of each and all of them, instructions that the jury find each of the defendants not guilty generally, if they believed the evidence, or not guilty of a secret assault on Moore or Elliott. These special instructions were refused, although taken in due form and apt time. They also asked for an instruction that there is a variance between the allegations of the indictment and the proof. Refused. Exceptions were duly reserved to these refusals. Exceptions were also taken to the charge, which will be noticed hereafter.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*Stewart & McRae for Stamey and Helms.*

*J. E. Little for Knotts.*

*Stack & Parker for Sikes.*

WALKER, J., after stating the case: The motion to quash was properly disallowed. It was based upon the ground of duplicity in the indictment, as the defendants were charged therein with a secret assault upon two persons, Neal Elliott and A. B. Moore. Motions of this kind are not favored. "The courts usually refuse to quash on the application of the defendant where the indictment is for a serious offense, unless upon

the plainest and clearest grounds, but will drive the party to a demurrer, or motion in arrest of judgment, or writ of error," as the case may require. *S. v. Colbert,* 75 N. C., at p. 373; Chitty's Cr. Law, p. 300; *S. v. Baldwin,* 18 N. C., 195; *S. v. Knight,* 84 N. C., 790; *S. v. Flowers,* 109 N. C., 841. The court *may* quash the indictment in the first instance, without requiring the defendant to plead, but this power is purely discretionary. Instead of dismissing it in this summary way, the court will leave the defendant to his other remedies, unless the defect be gross and apparent. *S. v. Baldwin, supra.* The statute provides that every criminal proceeding by warrant, indictment, information, or impeachment shall be sufficient in form for all intents and purposes, if it express the charge against the defendant in a plain, intelligible, and explicit manner; and the same shall not be quashed, nor the judgment thereon stayed, by reason of any informality or refinement, if in the bill or proceeding sufficient matter appears to enable the court to proceed to judgment. Revisal, sec. 3254. It is true that this Court held in *S. v. Nash,* 88 N. C., 618, that if one commits an indiscriminate assault, by one stroke, or pistol shot, upon two or more persons, it is an assault upon each and every one of them, following *S. v. Merritt,* 61 N. C., 134, and that an acquittal or conviction for the assault upon one was not necessarily a good plea in bar to a subsequent indictment for the assault upon the other, which was met by an able and vigorous dissent by *Justice Ashe;* but this does not establish the defendant's proposition, that the pleading is double if the State elects to indict for a single assault upon all. It is best for the defendant that it should do so, and decidedly to his advantage in at least one respect, which is that an acquittal or conviction will be a complete bar to any further prosecution for an assault upon each of the persons. If he is embarrassed in his defense by the joinder, or single prosecution, the court may, on proper application, require the State to elect, or perhaps to sever the prosecutions, treating the indictment as one in two counts for different offenses. 1 Bishop's New Cr. Law, sec. 442. No such motion was made in this case, nor do we think the facts, or a proper regard for the rights of the defendants, suggested that such a course should be taken. It is laid down that injuries inflicted on two or more persons by another's single act may be charged against the latter in a single count, for there is, or may be deemed to be, but one offense. Thus, a battery or murder of two or more persons may be alleged in one count. We have some authority contrary to this, but by reason and the better decisions, certainly if one bullet or one blow, or one wrongful impulse of any kind, or probably if one transaction, results in the injury or death of two or more persons, all may be alleged in one count as one offense. Where two, with intent to murder, commit a joint assault, the one with a knife and the other with a gun,

they may be jointly held in one count. And if a man shoots at two, meaning to kill one, but regardless which, a single count may contain the full accusation. So a libel on more persons than one may be averred in one count, without rendering it double, if the publication is a single act. Many acts, if together they constitute but one offense, may be laid in one count. Thus, assault, battery, and false imprisonment may be charged in one count, because, though when separately considered they are distinct offenses, yet collectively they constitute but one offense. 1 Bishop's New Cr. Law (2 Ed.), secs. 437, 438. This principle, as thus stated in the text-books, is supported by *Rex v. Benfield,* 2 Burrow, 980, 984; *Rex v. Giddings,* Car. and M., 436 (41 Eng. Com. Law Rep., 344 and star p. 634); *The King v. Jenour,* 7 Mod., 400; *Shaw v. State,* 18 Ala., 547; *Cornell v. State,* 104 Wise, 527; *S. v. Batson,* 108 La., 479; *Kannon v. State,* 78 Tenn., at p. 390, and cases cited; *U. S. v. Wiseman,* 182 Fed. Rep., 1017; *Oleson v. State,* 20 Wise, 62; *People v. Milne,* 60 Cal., 71; *Rucker v. State,* 7 Texas App., 549, and authorities cited. These cases hold, and many others might be cited to the same effect, that an indictment for an assault or murder of two persons is good upon its face, for the assault or murder may be committed in the same degree, by one and the same act. A person may, by a single act, endeavor to accomplish two or more criminal results. In such a case there can be no doubt that if the indictment sets forth the act and the intent to commit the two or more offenses according to the fact, it will not be open to the objection of duplicity. There is but one attempt, though the object aimed at is multifarious. In *Regina v. Giddings, supra* (41 E. C. L. Rep., 344), an indictment, which consisted of but one count, charged the four prisoners with assaulting George Pritchard and Henry Pritchard and stealing from George Pritchard two shillings and from Henry Pritchard one shilling and a hat, on 14 May, 1842. It appeared that the persons assaulted were walking together when the prisoners attacked and robbed them both. A motion was made to put the counsel for the prosecution to his election, upon the ground that the count charged two distinct felonies; but the court held that, as the assaulting and robbing of both individuals occurred at the same time, it was one entire transaction, and refused the motion. The great weight of authority, and we may safely venture to add, the almost unanimous opinion of the courts and text-writers, sustains this view. The case of *Rex v. Clendon,* 2 Strange, 870, which seems to be against it, was denied to be law in *Rex v. Benfield,* 2 Bunon, 984, and in other subsequent cases, until it may now be regarded as overruled and as no longer a precedent. See 93 Eng. Reports (Full Reprint), p. 905; 2 Hawkins Pleas of the Crown, ch. 25, sec. 89 (8 Ed.), p. 331. In Archbold's Cr. Pl. and Pr. (6 Am. Ed.), at side page 96, he says: "There is no objection to charging a defendant

in one count with assaulting two persons when the whole forms one transaction," citing *Rex v. Benfield*, 2 Burr., 984, an opinion by *Lord Mansfield, Chief Justice.* And Wharton's Cr. Law (7 Ed.), sec. 393, says that "A man may be indicted for the battery of two or more persons in the same count, or for libel upon two or more persons when the publication is one single act, or for a double homicide by one act, without rendering the count bad for duplicity." On the face of this indictment the assault appears to have been committed by one and the same act, and therefore to be taken as a joint one, upon a motion to quash, which is directed against the bill, as it is, and without adding thereto any extraneous facts. This exception, therefore, is overruled.

The defendants next complain of the instruction to the jury that "malice is presumed from the use of a deadly weapon," but this was not all of what the judge said, for immediately he told the jury, "if you find beyond a reasonable doubt from the evidence that deadly weapons were intentionally used by the defendants in committing an assault upon the said Neal Elliott and A. B. Moore without reasonable excuse therefor, if you find that an assault was committed upon them by the defendants, the defendants will be presumed to have acted maliciously." The statute provides that if any person shall maliciously commit an assault and battery with any deadly weapon upon another by waylaying or otherwise, in a secret manner, with intent to kill such other person, he shall be guilty of a felony and punishable by imprisonment in jail or the penitentiary for not less than twelve months nor more than twenty years, or by a fine not exceeding $2,000, or both, in the discretion of the court. Revisal, sec. 3621. It has always been understood that malice, as used in statutes describing an offense or a wrong, means, in its legal sense, a wrongful act, done intentionally, without just cause or excuse. If, without cause or provocation, a blow is given to a person, likely to produce death or great bodily harm, it is done of malice, because done intentionally and willfully, without any excuse. This is general malice, as distinguished from particular malice, which is ill-will against a person, and is required to be shown under some statutes, but not where the act itself implies a bad motive or a wicked heart. This definition originated, we believe, with *Justice Bayley* in *Bromage v. Prosser*, 4 Barn. and Creswell, 255, and has been almost unanimously adopted ever since. It was applied to criminal offenses in a very lucid opinion by *Chief Justice Shaw* in *Com. v. York*, 9 Metcalf (50 Mass.), 93, who said: "In *Wills v. Noyes*, 12 Pick., 324, the court charged the jury that legal malice might differ from malice in the common acceptation of the term; that to do a wrong or unlawful act, knowing it to be such, constituted legal malice. This was affirmed by the whole Court, who say that whatever is done 'with a willful disregard of the rights of others, whether it be to

compass some unlawful end, or some lawful end by unlawful means, constitutes legal malice.' So, in a more recent case, *Commonwealth v. Snelling,* 15 Pick., 340, the Court, after noticing the legal and popular meaning of the term 'malice,' say, 'in a legal sense, any act done willfully and purposely, to the prejudice and injury of another, which is unlawful, is, as against that person, malicious.' See, also, Foster's Crown Law, 256; Russell on Crimes (1 Ed.), 614, note, and *Com. v. York, supra,* where the reason for this law is fully explained. Citing 2 Starkie on Ev., 903, the Court there says that the word "malicious" imports nothing more than the wicked and perverse disposition with which the wrongful act is done—the *malus animus.* This definition of the term has been applied indifferently and indiscriminately to civil and criminal wrongs, with some exceptions noted, of which this case is not one. In *Taylor v. State,* 74 Tenn., 234, the defendant was indicted under a statute for a malicious assault by stabbing another, and the Court held, upon an appeal from a conviction of the assault, that, "Even if the case rested entirely on the testimony of the other witness, the existence of malice might be found in the use of a deadly weapon upon inadequate provocation, or upon a provocation brought about by the defendant with the purpose of using the weapon. *Nelson v. State,* 10 Hum., 528. The malice required to constitute malicious stabbing is malice in its common-law significance. The law presumes such malice from the stabbing, to rebut which the proof, either on the part of the State or the defendant, must show circumstances which, if death had ensued, would have mitigated the offense from murder to manslaughter, or excusable homicide, or left a reasonable doubt of the commission of the higher grade of crime." And many authorities sustain this view. 1 McLain's Cr. Law, sec. 121, says: "By the term 'malice,' as commonly used in criminal law, is meant in general simply the intention of doing a criminal act without justification or excuse, and it is for most purposes synonymous with criminal intent. It does not imply bad feeling toward, or desire to injure, any particular person." And again, at section 259: "Intent to kill is not necessarily an ingredient in a charge of malicious stabbing, and under such a charge the accused may be convicted, even though the circumstances show that death resulting from such an assault would be manslaughter and not murder, malicious intent being general malice and not malice aforethought. In such case malice against the individual is not essential, general malice being sufficient," citing *Nichols v. State,* 8 Ohio St., 435; *Taylor v. State,* 6 Neb., 234; *Tyra v. Com.,* 2 Metc. (Ky.), 1. See, also, *S. v. Schœnwald,* 31 Mo., 157; *S. v. Hambleton,* 22 ibid., 452; *In re Murphy,* 109 Ill., 31; *Com. v. Hicks,* 89 Mass. (7 Allen), 573. In *Davison v. The People,* 90 Ill., at p. 229,

it is said that malice is "a formed design of doing mischief to another, technically called *malitia præcognitata,* or malice prepense. It is either express, as where one with a sedate and deliberate mind and formed design kills another, which formed design is evidenced by certain circumstances discovering such intention, as in lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm, or implied, as where one willfully poisons another; in such a deliberate act the law presumes malice, though no particular enmity can be proved. Malice is always presumed where one person deliberately injures another. It is the deliberation with which the act is performed that gives it character. It is the opposite of an act performed under uncontrollable passion which prevents all deliberation or cool reflection in forming a purpose. If, then, a person deliberately uses a deadly weapon on another, it must be inferred that it was malicious. If there was fixedness of purpose in its use, it could only be from malice. The deliberation excludes all other conclusions than there was malice. It is not the mere use of the weapon that shows malice, but its deliberate use." And in *Com. v. Goodwin,* 122 Mass., at p. 35 : "There is no authority for the proposition contained in the eleventh request, that the word 'maliciously' means a feeling of ill-will, spite, revenge, and malice towards the person threatened. The willful doing of an unlawful act without excuse is ordinarily sufficient to support the allegation that it was done maliciously and with criminal intent." The Court then refers to the exceptions in regard to trespasses to property, punishable as malicious mischief, when cruelty or hostility or revenge towards the owner must be shown. It then concludes thus, at p. 36 : "The act itself implies criminal intent, and there is no occasion, in construing the statute, to hold that, to create the offense, anything more is required than is implied in the usual definition of malice," citing *Com. v. Williams,* 110 Mass., 401; *Com. v. Waldin,* 3 Cush., 558. This definition of malice has been, we think, adopted by this Court. *Brooks v. Jones,* 33 N. C., 260 ; *S. v. Long,* 117 N. C., 791, where it is said to exist, in law, if the wrong is inexcusable, "general malice being wickedness, a disposition to do wrong, a black and diabolical heart, regardless of social duty and fatally bent on mischief." But there is a recent case which has an important bearing upon this question, where the prisoner was indicted for "maliciously, wantonly, and feloniously" burning a warehouse. *S. v. Millican,* 158 N. C., 617. He assigned as error that the judge had failed to define the word "wantonly" to the jury. *Justice Allen,* for the Court, said with reference to this feature of the case : "There was no suggestion in the evidence, nor do counsel contend here, that the fire may have been caused by the defendants accidentally, and under the charge of the court the jury had to find, in order to convict the defendants, that they agreed

with Dempsey Wood, colored, to burn the warehouse, and that they at once carried out the agreement and deliberately set the building on fire, and if so, the act was of necessity wanton and malicious, and it could do no good to so describe it. In other words, his Honor would have been justified in charging the jury that, if they were satisfied that the defendants agreed to burn the warehouse, and that pursuant to that agreement they deliberately burned it, the act was wanton and malicious, and this is the only view presented to the jury upon which they could convict." Here the defendants, in plain violation of the law, a band of marauders, without any legal or moral excuse or justification, shoot down two officers of the law, who were at the time in the lawful and rightful discharge of their duty, and in the night-time, not only with implied but with manifest malice, to be gathered from the undisputed facts showing a most outrageous and vindictive criminal purpose to defy the law and resist its ministers even unto their death, and with every indication in their admitted acts of a wicked and diabolical motive, a disposition to do flagrant wrong, "being regardless of social duty and fatally bent on mischief." It was hardly necessary to discuss the technical question as to implied malice, but we might well have confined ourselves to the uncontroverted facts, which so clearly show particular malice, that it would have been harmless error if the judge had made any mistake in the part of the charge to which exception was taken. While it is true that the use of a deadly weapon in a sudden brawl may not necessarily imply malice, the use of one in a secret assault made in the darkness, and without a semblance of provocation, affords such convincing evidence of malice that to hold otherwise would be a repudiation of the plain and unanswerable logic of the facts. In this case, the lying in wait in the darkness, the sudden and unprovoked assault, the deadly character of the weapons employed, all disclose a bad and malignant purpose. *S. v. Long, supra.* If malice is implied from the use of a deadly weapon in murder, why not in an assault, when the plain intent is to kill, for the malice must, of course, exist at the time of the assault and does not depend necessarily upon the nature of the result, whether there ensues a homicide or only great bodily harm. It is the definite intent to kill without good cause or excuse, willfully and wrongfully executed, that fixes the malicious motive, as said in *S. v. Madison Johnson,* 23 N. C., 354, and *S. v. Jacob Johnson,* 47 N. C., 247. If a party fires his pistol with intent to murder, can his intent be changed by the accidental failure of his purpose, or by a slight movement of the victim's body, so that the shot misses the vital mark and saves his life, though wounding him severely? The intent is formed before or immediately at the time of the act which is to be done. If the other view were allowed to prevail, the statute would become nugatory.

But *Rex v. Matthew Hunt,* 2 English Crown Cases (1 Moody), 93, is precisely in point, the facts bearing a close likeness to those in this case. The prisoner was indicted upon a statute for a felonious and malicious assault, and was tried before *Mr. Justice Gasselee* at the Lent assizes for Cambridge, in the year 1825, for the offense, the specific intent charged being, in the three first counts, to prevent his apprehension for a larceny of the property of William Headley in the night-time, and, in the last count, to do the prosecutor some grievous bodily harm. He had cut Richard Cambridge, a servant of Headley, who was assisting the latter in arresting him. There was a conviction, the jury finding specially that he intended to do grievous bodily harm to anybody upon whom his blow might alight, though the particular cut was not calculated to do such harm. The wound of Cambridge got well in a week. The learned judge respited the sentence until the opinion of the judges could be taken, it having been contended by Pryme, his counsel, that there was no evidence of malice against Cambridge, who was cut, but against Headley only, and that upon the statute general malice was not sufficient, but it must be actual malice against the particular person; but *Lord Chief Justice Best* and *Littledale, J.,* held, upon grave consideration, "That general malice was sufficient under the statute, without particular malice against the person cut, and that if there was an intent to do grievous bodily harm, it was immaterial whether grievous bodily harm was done." It was also held that, "On an indictment for maliciously cutting, malice against the individual cut is not essential; general malice is sufficient; an intent to do grievous bodily harm is sufficient, though the cut is slight and not in a vital part; the question is not what the wound is, but what wound was intended."

This exception of defendants, therefore, is equally untenable. What is said in *S. v. Jennings,* 104 N. C., at p. 778, an indictment for a secret assault, as to the necessity of proving actual malice of the defendant at the time he stabbed the prosecutor, is not in conflict with the view now expressed, as the language was used there with reference to the special facts of that case, for it appeared that the parties were then engaged in an affray, and the defendant "covertly" cut the prosecutor in the back. There was no deliberation or premeditation about it, but an act apparently inspired by sudden passion or fury during the fight.

There can be no doubt, in any view of the facts, that the assault was a secret one within the meaning of the statute. The defendants were assembled near an old empty house about midnight; they saw the policemen approaching, and one of them said, "Yonder comes two of them G— d— policemen; let's kill them," and Sikes fired two shots and "shot Moore down," and then fired two more shots. The light of Moore's lantern flashed in Sikes' face, when he said, "Take that light out of my

face," and at once fired the first shot. Sikes was recognized by Elliott by the flash of the lamp in Moore's hand. Moore was evidently unconscious of Sikes' presence when the latter fired, and the court, at defendant's request, charged the jury that, if they believed the evidence, they should acquit Sikes of a secret assault on Neal Elliott, because he saw them by the flash of the lantern. But Knotts and Helms shot Elliott before he was aware of their presence, and if Sikes was present, aiding and abetting this assault, he is equally guilty with them, but he is surely guilty, with the others, of a secret assault upon Moore. They were all concealed in the darkness and behind a house, when they opened fire, and Moore fell at the first shot, before he knew they were there or had any opportunity to defend himself. This case falls obviously within the intent and spirit of the statute, and also within its very letter. The attack was made under the cover of darkness and the defendants were as effectually concealed as if they had been lying in wait in an ambush. If the State's testimony is believed, the jury could well have inferred therefrom that this officer of the law, A. B. Moore, was shot down while acting in the discharge of his duties and when he was utterly unconscious of the presence of his assailants. This is all that is necessary to sustain an indictment for a secret assault, according to all the authorities, from *Jennings' case,* 104 N. C., 774, to *S. v. Whitfield,* 153 N. C., 627. A. B. Moore testified that he did not see any of them before he was shot, nor did he hear Sikes say, "Take that flashlight out of my face."

It was contended that defendant Will Stamey was not guilty, as he took no part in the assault; but we think otherwise. He was there, furthering by his presence and his action, sympathy, and encouragement the common design. If the defendants were banded together with a common purpose, and Sikes shot Moore when Moore was unconscious of his presence, then all would be guilty of a secret assault upon Moore. If in furtherance of the common purpose Knotts and Helms shot Elliott when he was unconscious of their presence, then all would be guilty of a secret assault upon Elliott. He who hunts with the pack is responsible for the kill. An aider and abettor, or an accomplice, is as guilty as he who fired the pistols and wounded the policemen.

"As the creeper that girdles the tree-trunk, the Law runneth forward and
    back—
  For the strength of the Pack is the Wolf, and the strength of the Wolf is
    the Pack."

And so the Attorney-General argued to us, as we think, correctly. Stamey was present, and while perhaps not as bold and aggressive as the others, and while his courage may have failed at the critical moment, he was equally a participant in the unlawful act. It is not necessary,

however, that the accused should have been an original contriver of the mischief, for he may become a partaker in it by joining the others while it is being executed. If he concurs, no proof of agreement to concur is necessary. As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is complete. This joint assent · of minds, like all · other facts of a criminal case, may be established as an inference of the jury from other facts proved; in other words, by circumstantial evidence. *Spies et al. v. People,* 122 Ill., 213; 2 Bishop Cr. Law, 190, and note 7. Individuals who, though not specifically parties to the assault, are present and consenting to the assemblage by whom it is perpetrated, are principals when the assault is in pursuance of the common design. *Spies v. People, supra,* at p. 225; Wharton on Homicide (2 Ed.), sec. 201; *Reg. v. Johnson,* 7 Cox's Cr. Cases, 357. "There might be no special malice against the party slain, nor deliberate intention to hurt him, but if the fact was committed in prosecution of the original purpose, which was unlawful, the whole party will be involved in the guilt of him who gave the blow." Foster, p. 351, sec. 6. "Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any coconspirator in the accomplishment of the purpose in which they are all at the time engaged." *S. v. McCahill,* 72 Iowa, 111. It makes no difference at what time any one entered into the conspiracy (1 Greenleaf Ev., sec. ·111); it may be, as we have seen, at any time before it is fully executed. But Stamey was a part of this assemblage at the very beginning, and to show that he was consenting to the unlawful acts and joined in the common design and was really an active participant, we need only refer to the fact of Stamey's conduct before, at the time of, and after the shooting took place. They had assaulted and "held up" on the highway, on the same night, two negroes, Andy James and Haywood McCoy. Andy James testified: "I remember the night of the shooting. Me and Haywood McCoy went to Policeman Johnston about 15 minutes after 12. Me and Haywood McCoy were coming from an entertainment at the corner of Brevard Street and the Seaboard Railroad. Knotts walked out and stopped us and asked where we were going, and drove us down the railroad with a pistol. No one was with him then. He drove me down about a box-car length further, and two other men ran out from behind the box car. I did not know them before they got around us. They commenced searching us, and Knotts grabbed Haywood in the collar and Stamey felt of my pockets, and then Sikes threw pistol across my shoulder in Haywood's face, and the little fellow Stamey said, 'Let the niggers go on; they ain't got nothing.' I started on down the railroad; they still held Haywood there; then Helms came up the railroad, cursing, and said, 'What are

you doing here? If you haven't got nothing, you ought to have been going on.' I started on one side of the box car, started to run, and he shot. Bullets came over my shoulder." At the time Sikes fired his pistol at Elliott and Moore, Will Stamey was standing by his side, "in the thick of the fight," but did not shoot, if he had a pistol. Lester Tucker testified: "On that night, before the shooting, I saw all of the defendants on overhead bridge about 11:30. I saw pistol showing in the crowd. It was a .22 or a .32. I don't know who had it. Jim Knotts ·and Sikes were in the crowd. I heard the shooting. Then I dropped off to sleep. Soon Will Stamey came and waked me up. There was no one with him. He said a crowd over yonder had been shooting, and to go over and see if the police got any of them. We went to Seventeenth and Caldwell streets; saw Knotts and I whistled to him. He came up, and I asked him did they get any of them. He said, 'No, sir." He said Hiram Sikes got shot. Knotts asked me to go with Stamey and get ·Sikes and bring him on up to our house. Knotts gave Stamey a pistol and we went down, called and whistled for Sikes, but could not find him. Knotts said to Stamey, 'Protect yourself with pistol if any one comes up.' " This shows conclusively that he was there for the purpose of aiding and abetting his comrades, and the jury so found. But defendants contend that the evidence as to what occurred when the negroes were assaulted was not competent against them, being a collateral transaction. But this is not the case. Underhill on Cr. Law, sec. 90, p. 113, disposes of the exception, for it is there said: "The fact that evidence introduced to prove the motive of the crime for which the accused is on trial points him out as guilty of an independent and totally dissimilar offense is not enough to bring about its rejection, if it is otherwise competent. Under this exception to the general rule, where facts and circumstances amount to proof of another crime than that charged, and it appears probable that the crime charged grew out of the other crime, or was in any way caused by it, the facts and circumstances may be proved to show the motive of the accused. Thus it may be shown that the victim of a homicide, for which the defendant is on trial, was a police officer, or other person engaged in investigating the circumstances of another prior and independent crime of which the accused was suspected." *Com. v. Ferrigan,* 44 Pa. St., 386; *Moore v. United States,* 150 U. S., 57. It was held in *Dunn v. State,* 2 Ark., 229, that testimony of a person's guilt, or participation in the commission of a crime or felony, wholly unconnected with that for which he is put upon his trial, cannot, as a general rule, be admitted. But where the *scienter* or *quo animo* is requisite to and constitutes a necessary and essential part of the crime with which the person is charged, and proof of such guilty knowledge, or malicious intention, is indispensable to establish his guilt, in regard to the transaction in ques-

tion, testimony of such acts, conduct, or declarations of the accused as tend to establish such knowledge or intent is competent, notwithstanding they may constitute in law a distinct crime.

Defendant Stamey was keeping bad company that night, giving them aid and comfort by his presence, which was by no means passive, and by his evident willingness, as all the evidence shows, to "see them out." He was no casual or innocent onlooker, as his conduct, before and after the event, afforded sufficient ground upon which the jury might base a reasonable inference that he not only consented to,.but participated in, the felonious assault. *S. v. Hildreth,* 31 N. C., 440; *S. v. Jarrell,* 141 N. C., 722; *S. v. Pridgen,* at this term. Being judged by his companions (*noscitur a sociis*), though not so ardent or violent as they were, not having used a deadly weapon and having fled at the crisis of the combat when danger was imminent, he still is as guilty as they, both in a legal and moral sense, and therefore must share their fate. The cases of *S. v. Kendall,* 143 N. C., 659; *S. v. Bowman,* 152 N. C., 817, and *S. v. Cloninger,* 149 N. C., 567, furnish analogies upon the question of his being an aider and abettor, or principal in the second degree. "The least degree of consent or collusion between the parties to an illegal transaction makes the act of one of them the act of the other," and suffices to show a conspiracy. *S. v. Anderson,* 92 N. C., 733, citing 2 Wharton Ev., sec. 1205, to which we add Underhill on Ev. (1898), sec. 491.

The characters of defendants were not involved, as they did not take the stand as witnesses in their own behalf, nor was there any evidence on that subject. It was said in *S. v. O'Neal,* 29 N. C., 251: "The rule is then established that no deduction results in law unfavorable or favorable to the character of an individual charged by an indictment from the fact that he has introduced no evidence to show he is a person of good character. The character, not appearing either good or bad, necessarily stands indifferent." See, also, *S. v. Danner,* 54 Ala., 127; *S. v. Spurling,* 118 N. C., 1250; *S. v. Castle,* 133 N. C., 769. The refusal to instruct that the law presumed defendants were men of good character was therefore correct.

The comments of the solicitor were made merely in explanation of an argument of defendants' counsel and was entirely proper. Defendants cannot complain of their own wrong in provoking the discussion, as they started it. There was no harm done, anyhow.

The punishment was not unusual or excessive, but was mild as to some of the defendants, and certainly not immoderate as to any of them. They conspired to take the life of the policemen, who were, at the time, acting strictly within the line of their duty, and in doing so committed a crime of grave enormity. Besides, there are other matters which show

that they belong to the criminal class and that they were abroad that night for no good purpose, all of which the judge might well consider in awarding punishment.

We may say, before closing, that we have not overlooked the cases cited by defendants' learned counsel (who have defended them with great skill and ability) upon the question of duplicity in the indictment, viz., *S. v. Hall,* 97 N. C., 474; *S. v. Cooper,* 101 N. C., 684, and *S. v. Harris,* 106 N. C., 382. There distinct and separate offenses, having no necessary relation to each other and committed between different parties, were joined in one count. Not so here, for this assault was committed by the same parties upon Elliott and Moore—quite a different case—and it is more like the other authority cited, *S. v. Wilson,* 121 N. C., 650, in which the present *Chief Justice* distinguishes them.

We have carefully examined and reviewed the record, and there is no error that we have been able to find by diligent search.

No error.