THE PEOPLE OF THE STATE OF NEBRASKA, EX REL., CHRISTOPHER PUTNAM AND AMOS D. GEORGE v. COMMISSIONERS OF BUFFALO COUNTY, AND THE KING BRIDGE COMPANY, OF TOPEKA, KANSAS.

1. **County Commissioners**: ERECTION OF PUBLIC BUILDINGS AND OPENING ROADS. In letting contracts for the erection of county buildings, and for the improvement of such roads as may be of general necessity, county commissioners must award the same to the lowest responsible bidder.

2. ————: BRIDGES: LETTING CONTRACTS FOR. Public bridges are parts of public roads, and the provisions of Sec. 16, Chap. 67, Gen. Stat., requiring contracts for the construction of roads to be let to the lowest competent bidder, apply to the letting of contracts for the erection of bridges; and it is the duty of county commissioners to adopt plans and specifications, in advance of the letting, as a basis on which bids may be received. LAKE, CH. J., *dissenting*.

3. **Construction of Statutes.** Whenever a statute requires the performance of an act for the sake of justice or the public good, the word "may" is the same as "shall," and imposes a positive and absolute duty.

4. **County Commissioners**: ACTION AGAINST. Where precinct or county bonds are placed at the disposal of county commissioners for the purpose of erecting a wagon bridge over the Platte river, it is their duty to let

the contract for the construction of the same to the lowest responsible bidder; failing to do so, such bidder or a tax-payer of the county may maintain an action to compel them to so award the contract.

5. ———: The commissioners have no authority to require each bidder for the erection of a bridge to accompany his bid with his own plans and specifications, they adopting such plans as they see fit and accepting the bid accompanying the same, no opportunity being given to others to bid on such plans. Such conduct opens the door to corruption, favoritism, and fraud; and a contract awarded on such a letting is void.

THIS was an application to this court for a writ of mandamus. It was based upon affidavits setting forth that the county commissioners of Buffalo county, having determined to erect a bridge across the Platte river at Kearney Junction, for the erection of which precinct bonds had been voted, met on the 29th day of July, 1873, not as a board of commissioners, but informally, and examined plans and specifications submitted to them by the King Wrought Iron Bridge Company and by Henry T. Clarke; that on the following day the commissioners being in regular session, after considering the respective bids, awarded the contract for the erection of the bridge to the King Company for $13.00 per lineal foot, whereas the bid of Henry T. Clarke was for $8.75 per lineal foot; and the relators prayed that said award be set aside and the contract be made with Clarke.

An alternative writ was allowed and upon the return day thereof, the commissioners filed their answer thereto in substance as follows:

"The defendants say that they met unofficially on the 29th day of July, 1873, to receive bids for the construction of said bridge; that the said Henry T. Clarke and George E. King met with these defendants on that day for the purpose of making bids for the erection and construction of said bridge; that Clarke was there in person to bid on his own behalf and King to bid on behalf of the King Wrought Iron Bridge Company of Topeka Kansas; that prior to that time said parties were

notified by the said defendants to furnish their own plans and specifications to accompany their respective bids, and each of them; that the commissioners would not furnish plans and specifications for said bridge, but desired to have the bidders for the contract of erecting and constructing the same to furnish their own plans and specifications; that at the time of making the bids of the said Clarke and the said King it was understood between them and each of them, and the said commissioners, that the said Henry T. Clarke and the said George E. King were each to furnish plans and specifications to correspond with each of their respective bids; that there was no understanding or agreement of any kind or nature whatever between the said Clarke and the said King or either of them, and the said commissioners, by which bids were to be made and received with reference to any particular plan; that said commissioners did not agree, on the 29th day of July, 1873, upon the character of said bridge, but that both Clarke and King were at liberty to submit any kind of plans and specifications, and many kinds of plans and specifications, accompanying each of the same with the price thereof, and were requested to furnish various and different plans and specifications together with the corresponding price of each separate plan and specification for said bridge so that the commissioners might have an opportunity to select from the various and different plans and specifications with the corresponding prices, the best plan and specification for the price; that the commissioners prior to the 29th of July, 1873, and on that day before any bids had been made, stated to said Clarke and the said King that they reserved the right to reject any and all bids; that it is wholly untrue, as alleged by the relators, that the defendants on the 30th day of July, 1873, sitting as the county commissioners of the said Buffalo county, received bids upon, or with reference to, any

particular plan or character of bridge, but that all bids received on that day, and before that time, were received without reference to any particular plan or character of bridge except such plans and specifications as accompanied each bid; that prior to the 29th day of July, 1873, and on that day, and before any bids were received, it was stated by the commissioners in the presence and hearing of the said Clarke and the said King and to each of them, that bids for the erection and construction of said bridge must be made for bonds, and not otherwise; that the commissioners did not wish to sell the bonds themselves and would not sell them; that whoever built the bridge must take Kearney precinct bonds for his pay, and the bonds of said Buffalo county, if $30,000.00 in bonds of said precinct should not be sufficient, provided always that the electors of Buffalo county should vote the additional bonds if the same should be required; that Clarke contrary to the notice previously given him, and contrary to repeated and frequent requests made to him by the commissioners to bid to erect and construct said bridge for a certain price in bonds, made three bids to erect and construct the bridge each of which was a bid for cash and not for bonds, and that said Clarke wholly failed to make any bid whatever in bonds; that it is untrue as alleged by the relators that Clarke at the time he made his bids for $8.75 per lineal foot included therein an offer to receive the bonds of Kearney precinct and the bonds of Buffalo county or either of them in payment of said work; that after the contract was awarded, Clarke for the first time offered to receive said bonds in payment for the work at less than par value, and that he made no offer to receive the same at a discount or otherwise until after the contract had been awarded to the King Bridge Company."

It was also alleged in the answer that the plans offered by Clarke were vague, uncertain and indefinite, while

those of the King Company were good and sufficient plans and specifications upon which to erect a suitable bridge; that the bonds of the precinct had been delivered to the King Company, and by them sold to third parties; and that the bonds were delivered long prior to the application for this writ, and that the company had constructed under their contract about one-third of the bridge.

Upon the coming in of the answer, considerable testimony was taken orally before the court. The different plans proposed by Clarke were offered in evidence, and the facts relative to the meeting of the commissioners and their acceptance of the bid made by the King Company proven as set forth in the opinion of the court.

The statutes relative to the powers and duties of county commissioners in regard to roads and bridges are found on pages 953 and 954, General Statutes 1873, and are as follows:

"Sec. 15. One-third of all moneys paid into the county treasury in the discharge of road tax, shall constitute a county road fund, which shall be at the disposal of the county commissioners for the general benefit of the county, for road purposes; the other two-thirds of all moneys paid into the county treasury in discharge of road tax, shall constitute a district road fund, which shall be expended only in that district from which it was collected, and only for the following purposes:

*First.* For the construction and repair of *bridges and culverts*.

*Second.* For the payment of damages of the right of way of any county road.

*Third.* For the payment of wages of supervisors, and for the expense of procuring the necessary guide-boards.

*Fourth.* For the payment of the wages of commissioners of roads, surveyor, chainmen, and other persons engaged in locating or changing any county road.

*Provided, however,* that the county commissioners shall have power, upon receiving a petition signed by at least two-thirds of the qualified electors of any district, to order that any road moneys in the treasury belonging to the district be expended in any other district, under the direction of the supervisor thereof.

*Provided, further, that the county commissioners may levy an additional cash tax for bridge purposes, not to exceed five mills on the dollar of the assessed value of all taxable property, to be levied and collected as other taxes, which special tax, when so collected, shall be exclusively applied to building or repairing permanent and substantial culverts or bridges, under the direction of the county commissioners.*"

"Sec. 16. The county commissioners may let contracts to the lowest competent bidder for the improvement of such roads as may be of general necessity, and pay for the same by orders on the county treasury, payable out of the county road fund; but no contract shall be entered into for a greater sum than double the amount of money on hand in the county road fund; and every bidder before entering on any work pursuant to contract, shall give bond to the county, with at least two good and sufficient sureties, in any sum double the amount of the contract; which bond shall be approved by the county commissioners, conditioned for the faithful execution of the contract."

*J. M. Woolworth,* for the relators.

*Hamer & Conner,* for the commissioners, contended, *inter alia,* as follows :

I.   The application for the writ is insufficient because the affidavits on which the application is made fail to show that the relators are tax payers or have any interest in the letting of the contract.   The affidavits allege

the adoption of a certain plan by the commissioners, but fail to show that either of the bids of Henry T. Clarke were made upon the plan so alleged to have been adopted.

II.   A rule to show cause why a mandamus should not issue to an inferior court is never granted unless a *prima facie* case is presented requiring the interposition of the supreme court.   *Ex parte Taylor*, 14 *Howard*, 3.

III.   If Clarke ever had any claims to the contract, he forfeited them by delay.   For aught that appears in the writ the bridge was built and paid for months ago. The delay is fatal.   *Kellogg v. Ely*, 15 *Ohio State*, 64. *Ingerson v. Berry*, 14 *Id.*, 322.

IV.   The testimony discloses the fact that the commissioners considered the plans and specifications of Clarke insufficient and unfit for a bridge.   When the bid would be such as to defraud the county or state the board may use discretion, and mandamus will not lie to compel the board to award such contract.   *The People v. The Contracting Board*, 33 *Barb.*, 511.   *Id.*, 33 *New York*, 382.

V.   The statute confers authority to determine the merits of the proposed respective structures of competing bidders for public buildings and bridges upon the county commissioners, and having general authority to contract for and on behalf of the county this power to select must be with the commissioners.   A lawful discretion vested in an individual officer or corporation can not be destroyed or limited by the writ of mandamus. *Ex parte Black*, 1 *Ohio State*, 30.   *Moses on Mandamus*, 104.   *The United States v. Guthrie*, 17 *Howard*, 284.

*J. C. Cowin*, for the King Bridge company argued that the writ did not state facts sufficient to warrant the issuance of a peremptory writ of mandamus, and that the King Company was an improper party to this proceeding.

MAXWELL, J.

A board of county commissioners are held to be a *quasi* corporation, a local organization which for purposes of civil administration is invested with a few of the functions characteristic of a corporate existence. *Commissioners of Hamilton County v. Mighels*, 7 *Ohio State*, 115. A grant of powers to such a corporation must be strictly construed. *Id.*, *Treadwell v. Commissioners*, 11 *Id.*, 190. And in a recent case this court held that "the grant of powers to such officers must be strictly construed, because when acting under special authority they must act strictly on the conditions under which the authority is given. They can only exercise such powers as are especially granted, or as are incidentally necessary for the purpose of carrying into effect such powers; and where the law prescribes the mode which they must pursue, in the exercise of these powers, it excludes all other modes of procedure." *The Sioux City and Pacific R. R. v. Washington County, etc.*, 3 *Neb.*, 42.

Section 9 of Chap. XII, Revised Statutes, 1866, in force at the time this contract is alleged to have been entered into, provided for advertising for bids for building a court house, jail, and offices for register of deeds and county clerk, the advertisement for bids to contain plans and specifications for such buildings, and the contract to be let to the lowest responsible bidder.

An act approved October 29, 1858, provided the mode of locating, changing, or discontinuing county roads.

*Laws* 1858, 229. Section four of the act supplemental to the same, approved January 11, 1860, provided that county commissioners "may let contracts to the lowest and best bidder for the improvement of such roads as may be of general necessity, and pay for the same by orders on the county road fund, but no contract shall be entered into for a greater sum than double the amount of the fund on hand at the time of letting the same." *Laws* 1859, 51. In 1862 the law was again amended, and section sixteen as it now exists was adopted. *Laws* 1861–62, 80. In 1866, section fifteen was further amended to allow county commissioners to levy an additional cash tax for bridge purposes, not to exceed five mills on the dollar on the assessed valuation, for building and repairing permanent and substantial culverts and bridges, under the direction of the county commissioners. *Revised Statutes* 1866, *page* 346.*

The word "road" is generally applied to highways, and as a generic term it includes highway, street, and lane. *Webster Dic.*, 1144. A public bridge is a part of a road, and this without regard to its length or cost. It is a well known fact that a very large proportion of the expenditure necessary to be made by the several counties for the improvement of roads in this state, is required for the construction of bridges and their approaches, and we cannot presume that the legislature intended the law to apply to grading alone, and that bridges and their approaches should be excepted from the operation of the law.

The fund in this case is derived from precinct and county bonds placed under the control of the county commissioners of Buffalo county for the purpose of erecting a public bridge over the Platte river. In the expenditure of this fund, the commissioners should be governed by the same rules in letting the contract, that they would

---

*Same section now in force. Gen. Stat., 953, 954. *Ante p.* 154.

be in letting contracts for public bridges to be paid for out of the road fund. But it is contended that the provisions of the statute that the commissioners *may let* contracts to the lowest responsible bidder is simply permissive, and not mandatory. Judge Dillon says, " the cases sustain the doctrine that what public corporations or officers are empowered to do for others, and which is beneficial to them to have done, the law holds they ought to do. * * * The power in such cases is conferred for the benefit of others and the *intent* of the legislature, which is the test in such cases, ordinarily seems, under such circumstances, to be, to impose a positive and absolute duty." *Dillon on Municipal Corporations, Sec.* 62. Wherever a statute directs the doing of a thing for the sake of justice or the public good, the word *may* is the same as *shall. Carth.*, 293. *Salk.*, 609. *Skin.*, 370.

In the case of *The People, ex rel., v. Weston, Auditor,* 3 *Neb.*, 323, the rule is laid down that in the interpretation of statutes, " the law is the best expositor of itself, that every part of it is to be taken into view for the purpose of discovering the mind of the lawgiver, that the details of one part may contain regulations and subject matter restricting the intent of general expressions or words in another part of the same law, and hence, that every part of the law is to be considered and the legislative intent is to be extracted from the whole of it." But it is contended that the fund derived from the tax of five mills on the assessed valuation, to be expended under the direction of the county commissioners in the construction of bridges and culverts, is excepted from the operation of the law requiring contracts for the improvement of roads to be let to the lowest competent bidder, and that the law applies exclusively to contracts which are to be paid out of the road fund. It is only necessary to say that the amendment providing for a tax of five

mills on the dollar, to be expended for bridges and culverts, took effect July 1, 1866, as an amendment to the *road* law, and the fund so provided is an additional *road* fund to be exclusively applied, however, in the erection and reparation of bridges and culverts. The money is to be expended under the direction of the county commissioners. A certain portion of the fund known distinctly as the road fund is apportioned among the several road districts, to be expended under the direction of the supervisors thereof; and the provision that the fund, raised by the tax of five mills for bridge purposes, should be expended under the direction of the county commissioners, is evidently intended to prevent any portion of that fund from being distributed to road supervisors for the use of their respective districts. Taking the entire law together, we think it is very clear that the provision requiring contracts for opening and improving roads to be let to the lowest competent bidder, applies to all contracts of that kind, including contracts for the erection of bridges and culverts, they being a part of the road. So, from the necessity of the case, it follows, that plans and specifications must be adopted in advance as a basis on which bids may be received.

In this case it appears from the evidence that the commissioners met in secret session, several miles away from the county seat, on the day preceding that for letting the contract; that bids were there received, the commissioners requiring each bidder to furnish his own plans and specifications, they assuming to adopt such plans as they saw fit and to accept the bid accompanying the same. It also appears from the evidence that they met at the county seat for a short time on the day on which the contract was to be let, and accepted the highest bid made, that a bond was accepted by the commissioners for the completion of the contract, which is now claimed to be no security whatever, and thirty thousand

dollars of the bonds of the precinct delivered to the contractor, without authority and before any part of the bridge had been erected; and that is now urged as a reason, in this court, why the King Company should be permitted to build the bridge in question, otherwise, it is claimed, the bonds will be lost to the precinct.    No equities can be founded on the wrongful delivery of the bonds, even if they have passed into the hands of innocent purchasers, and the commissioners are individually liable for any wrongful application of the funds in their hands.    But a contract made in defiance of law cannot be made valid by an attempted payment of the consideration in advance.

There is no doubt of the right of the lowest responsible bidder, or of a taxpayer of the proper county in a proper case, to maintain an action of this kind, and in no other way can the rights of bidders, and the public, be fully secured and enforced.    In the case of *Boren & Guckes v. Comr's of Darke Co.*, 21 *Ohio State*, 323, the court held: "The power conferred by the statute was to award the contract to the lowest bidder; this they have not done, and the power to do this remains to be exercised by them.    To hold that an unauthorized award of the contract exhausted their power to make the only award and contract they were authorized to make, would afford another easy mode by which the commissioners might nullify the statute."    To permit commissioners to accept plans and bids thereon at the same time, they accepting such as they approve, prevents all competition and opens the door to corruption, favoritism and fraud, and is against the policy of the law. *Boren v. Comr's*, 21 *Ohio State*, 323.    The estimated cost of this bridge is at least fifty thousand dollars.    Is it not remarkable that plans and specifications were not prepared in advance, and bids invited thereon?    There being no basis on which bids could be received no valid

11

contract can be founded thereon; therefore the contract made by the county commissioners with the King Bridge Company is void, and there being no valid contract with the King Company, none can be awarded to Clark.

Mr. Justice Gantt concurred in the foregoing opinion. Chief Justice Lake concurred in the judgment denying the writ, but dissented from the views taken by the majority of the court upon the construction of the statute, and filed the following opinion.

Lake, Ch. J.

While I am clearly of the opinion that the prayer of the relators must be denied, it is impossible for me to give my assent to several of the propositions advanced by a majority of the court. I will therefore, very briefly, give the reasons why, in my opinion, this writ should be withheld.

From the pleadings and testimony, it appears that the commissioners of Buffalo county, being desirous to construct a wagon bridge across the Platte river, invited proposals therefor without having previously determined the precise kind or description of bridge they would have, leaving it to the respective bidders to furnish, together with their bids, plans and specifications of their own, from which the commissioners would select the one, which under all the circumstances they should consider the best. On the 29th day of July, 1873, bids were made by the King Wrought Iron Bridge Company and by Henry T. Clarke, respectively, upon substantially the same general plan, but differing in the details so widely as to leave it quite doubtful, and difficult to determine, which one would, in fact, prove to be the more desirable, or valuable to the county, in case it were adopted.

The bid of the King Wrought Iron Bridge Company was for thirteen dollars per lineal foot, payable in the

bonds of Kearney precinct, which it seems had been voted for this purpose, while that of Clarke was for eight dollars and seventy-five cents per lineal foot, but payable in money. Subsequently, however, on the same day, Clarke offered to take the bonds in payment at eighty cents on the dollar, which made his bid the lowest, provided his bridge were equally as good as that of his competitor. Without very much reflection, apparently, and in exceeding great haste, the bid and plans of the King Wrought Iron Bridge Company were accepted by the commissioners, the contract in question entered into, and the bonds of said precinct actually delivered in payment before a single blow towards the construction of the bridge had been struck. But, notwithstanding the fact that the testimony shows, very satisfactorily to my mind, that the course pursued in this instance by the commissioners was not at all calculated to promote the best interests of the people, yet I do not think such a case is made out as calls for, or would at all justify, the application of the corrective which is here sought.

In my opinion, the radical difficulty in respect of the control of county commissioners in the erection of bridges lies in the almost unlimited discretion with which our statutes vest them in dealing with this subject. And it is in this particular, that I find myself wholly unable to agree with my associates. In many of the states we find ample provision made by statute for the guidance and control of officers intrusted with the erection of public buildings, bridges, and the like, by which they must advertise for a certain time, and in a certain manner, for bids to do the work according to plans and specifications previously agreed upon. But, in respect of bridges, especially, we have no similar statute in this state; the whole matter is left to the wisdom and sound discretion of the commissioners of the several counties; which discretion, so long as exercised in good faith, is

entirely beyond the reach or control of any authority whatsoever. But, while this is true, it by no means follows, if it be clearly shown that the commissioners are proceeding corruptly in the exercise of such discretion, to the prejudice of the public interests, or of individual rights, that they may not be enjoined by the courts, or compelled to answer in damages for their malfeasance.

In the opinion of my associates, section 16, chap. 67, General Statutes, requires that contracts for the erection of permanent bridges within a county, shall be let to "the lowest competent bidder" and that this necessitates the previous procurement of plans and specifications to which all bids must conform. I do not so understand this provision. It is clear to my mind that this section has reference solely to such work, grading, turnpiking, and the like, which may be paid for out of the county road fund proper, and not to those expensive, permanent bridges, referred to in the last proviso of the preceding section, which are to be built "under the direction of the county commissioners," and paid for out of a fund raised especially for that purpose, as in said section provided.

There is another consideration that, in my opinion, ought to have much weight in the determination of this particular question, and lead this court to hesitate long before announcing the conclusion that all contracts for permanent bridges must be let to the lowest bidder. It is a fact of common notoriety that most, if not all, of the very best bridges are patented, and can only be built by the respective patentees, or the person who has purchased the right for the particular state or territory. In such case it is clear that there can be no competition as to the building of a bridge of any one particular patent; and it would be an act of folly for the commissioners to announce that they had settled upon a structure which only a single individual, or company had the right to build, and

then to advertise for proposals, in the expectation of competition, for its erection. The only sensible course to pursue in such case would be the one ostensibly taken by these commissioners, to invite competition between the owners of the most valuable patents, leaving the selection to be made after due consideration of their respective merits, as well as the cost of each. This I believe to be the course that a prudent, careful man would take, in such case, if the matter concerned him alone, and I can see nothing in our statutes which ought to prevent the commissioners of a county from acting in like manner, in behalf of the public.

On the argument of the case, no question was raised, either as to the legality of the fund out of which payment was to be made for the bridge, or as to the right of the commissioners to deal with it. But, notwithstanding this fact, I cannot forbear the suggestion that the authority of Kearney precinct to issue these bonds, to my mind is not altogether clear, and may admit of very serious doubt. Should it be here adjudged that these bonds were issued without authority, it would of course be fatal to the claim of the relators. Inasmuch, however, as I am satisfied, that for other reasons, already stated, the writ must be denied, and for the further reason that no argument has been heard thereon, I forbear the expression of an opinion on this point, at this time.

For the reason therefore, that under our statutes the duties of county commissioners in the building of permanent bridges, are chiefly of a judicial, or discretionary character, especially so of the particular kind of structure they will have, I do not think this court has any authority to compel them to adopt Clarke's plan, or any other definite description of bridge, but that in this matter they should be left to the exercise of their own judgment entirely.

For these reasons, I concur in the opinion, that the

peremptory writ must be withheld, and the case dismissed at the cost of the relators.

WRIT DENIED.