No. 20,208.

THE TOPEKA BRIDGE & IRON COMPANY, *Plaintiff*, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LABETTE, *Defendant*.

SYLLABUS BY THE COURT.

1. BRIDGE CONTRACTS—*Complete Plans and Specifications to be on File— Purpose of Requirement of Statute.* The purpose of the statutory provision that all contracts for the erection of certain public buildings or the construction of bridges shall be awarded on a public letting to the lowest responsible bidder (Gen. Stat. 1909, § 2081), and the provisions of chapter 14 of the General Statutes of 1909 (§§ 643-678), requiring that when a county deems it necessary to build a bridge it shall determine upon a plan, the material to be used, and estimate the cost thereof, and that "the plans and specifications for the bridge shall be left in the office of the county clerk for inspection" (§ 664) of prospective bidders, is to secure economy and to protect the public from collusive contracts which would result in favoritism and fraud.

2. SAME—*Erection of Reinforced Concrete Bridges—Character of Plans and Specifications Required.* Although when these statutes were first adopted the construction of reinforced concrete bridges was an art unknown in this country, nevertheless the statute meant then just what it means now: that the plans and specifications on file for the inspection of bidders must, so far as the nature and character of the proposed work will admit, be sufficiently definite and explicit to enable bidders to prepare their bids intelligently on a common basis.

3. SAME—*Contract Can Not be Changed after being Awarded.* After a contract for the erection of a bridge has been awarded it can not lawfully be changed by additional specifications in a detailed working plan

furnished by the contractor and approved by the county and by which substantial changes are made in the requirements submitted to the other bidders.

4. SAME—*Incomplete Plans and Specifications on File—No Additions can be Made Thereto.* If the relative amounts of concrete and steel to be used in the construction of a reinforced concrete bridge could not from the plans and specifications on file be definitely known and understood by all the bidders, but were to depend upon the design of the success-ful bidder and upon the additional plans subsequently approved by the county board, all bidders would not be placed upon an equal basis, and, besides, it would be impossible for the board to have before it when the bids were offered a correct estimate of the cost of the bridge.

5. SAME—*Incomplete Plans and Specifications—No Chance for Competi-tion.* Wherever the plans and specifications on file for the inspection of bidders are so general as to admit of any substantial variation of detail, then active, intelligent competition among bidders is prevented, favoritism and corruption are made possible, and the purpose of the statute has not been complied with.

6. SAME—*Certain Statutes Relating thereto—Repealed by Implication.* The enactment of chapter 68 of the Laws of 1911, repealed by im-plication section 14 of chapter 77 of the Laws of 1879 (Gen. Stat. 1909, § 673), which required that in all cases where the cost of the bridge exceeds two thousand dollars the question must be submitted at an election before appropriation is made.

Original proceeding in mandamus. Opinion filed June 10, 1916. Writ denied.

*D. W. Mulvane, C. E. Gault,* and *D. R. Hite,* all of Topeka, for the plaintiff.

*S. M. Brewster,* attorney-general, *S. N. Hawkes,* assistant attorney-general, and *E. W. Columbia,* county attorney, for the defendant.

The opinion of the court was delivered by

PORTER, J.: In this action the plaintiff seeks by mandamus to compel the defendant to carry out a contract for the erection of a bridge. In a former opinion (*Bridge & Iron Co. v. Labette County,* 97 Kan. 142, 154 Pac. 230), it was held that inas-much as the remedy in an action at law is not fairly adequate, mandamus is a proper remedy. Because of the fact that de-fendant desired to aid the court in its solution of the question of law involved, by presenting testimony relating to rein-forced concrete bridge construction, leave was granted to both

parties to submit evidence. This has been done by the filing of affidavits, and the case is now here for final disposition.

On April 8, 1915, the board of county commissioners of Labette county adopted a resolution declaring it was necessary to build a certain bridge at a cost not to exceed $4500. On the same day a plan and specifications of the proposed bridge were filed with the county clerk, who thereupon duly advertised for bids to be submitted on May 8, 1915. The plaintiff was the lowest bidder and entered into a written contract with the county to construct the bridge. It seems that the board was willing to have the plaintiff proceed with the erection of the bridge, but has been notified by the attorney-general that the contract was illegal and void, because the plan and specifications upon which the bids were invited do not satisfy the requirements of the statute regulating the letting of such contracts, and for that reason the board adopted a resolution attempting to cancel the contract. The plans and specifications on file with the county clerk contained the following clause:

"The contractor shall submit detailed plans for and shall receive a written approval of such detailed plans from the Board before he shall commence any work or buy any material for the work covered by these specifications. Such detailed plans, when properly approved, shall become a part of the contract, and shall be binding on both parties."

The plaintiff's bid was approved May 8, 1915, and the written contract, the validity of which is here involved, was entered into on that day. Three days later the plaintiff submitted a detailed working plan showing with particularity the manner in which it proposed to build the bridge, which was approved by the board and its consulting engineer as being in strict conformity with the general plan and specifications determined upon by the defendant and filed with the county clerk.

The whole controversy between the parties involves the question whether the statute requiring a plan and specifications to be filed with the county clerk for the inspection of bidders is satisfied by the filing of the plan and the specifications adopted in this case, or, on the contrary, can only be complied with by the filing of detailed drawings and exact specifications. It is the contention of the defendant that if each bidder shall bid upon a detailed working drawing of his own there can ordinarily be no competition in the bids as to the bridge

actually built by the successful bidder according to his own plans. The plaintiff contends that the plan and the specifications which the defendant filed for the inspection of bidders complied with the statute; that it is necessary that something be left to the discretion of the board, who must determine in each instance what competition the nature of the case will admit and what is the best method to secure such competition; and that, in the absence of any evidence of fraud or unfairness, the course pursued by the defendant in letting the contract in question must be held as within such discretion and valid.

In the affidavit for the writ it is alleged, and considerable evidence has been offered to sustain the statement, that ever since 1879, when the provisions requiring plans and specifications to be determined and filed with the county clerk prior to the letting of a contract were enacted, it has been the uniform practice of boards of county commissioners, whenever they deemed it necessary to build a county bridge, to determine upon a plan or general design as distinguished from a detail or working drawing, and to adopt such specifications as in the judgment of the board would result in the construction of the kind of bridge desired, and to file with the county clerk for inspection this general plan and specifications. The practice during all this time has been for bidders to submit detail drawings showing the means to be employed to conform with the general plan and specifications, and these detail plans were then examined to see if they conformed with the general plan and specifications. Recently, however, the attorney-general of the state has advised the defendant and other counties that this method is illegal and that the statutory requirements can be satisfied only by filing with the county clerk a detailed working drawing of the proposed bridge for the inspection of those who might bid for the contract, and that such plan must be in detail to such an extent that the contractor can proceed with the work without additional or supplemental plans and that the plans and specifications must contain such particulars that the successful bidder could and must construct the bridge in strict conformity therewith and not otherwise.

Because of the uncertainty respecting these statutes and the powers they confer upon the several counties, and the

great public interest in the question involved, this case has been advanced for early hearing.

Section 2081 of the General Statutes of 1909, reads in part as follows:

"All contracts for the erection of any courthouse, jail, or other county building, or the construction of any bridge the cost of which exceeds one thousand dollars, shall be awarded, on a public letting, to the lowest responsible bidder."

Article 2 of chapter 14 of the General Statutes of 1909 (§§ 660-673), relating to the building of bridges in counties having a population exceeding twenty thousand, the class to which the defendant belongs, provides "when the board of county commissioners deem it necessary to build a bridge, it shall determine upon a plan, the material to be used, and estimate the cost thereof." (§ 661.) Section 664 provides that "the plans and specifications for the bridge shall be left in the office of the county clerk for inspection," and also fixes the time for giving notice of the letting of the contract. These provisions have been in force since 1879. At the 1913 session the legislature passed an act relating to the construction of reinforced concrete bridges which reads:

"That it shall be the duty of the board of county commissioners of each county, and the mayor and common council of each incorporated city, and the township board of each township in the state, in constructing bridges and culverts on the public roads and highways over which said officials have control, to cause the said bridges and culverts to be constructed of concrete, reinforced concrete, stone, corrugated iron, which shall be ninety-nine per cent pure, or steel, or both in preference to steel, in each and every case where such bridge or culvert can be constructed at a cost not to exceed 130 per cent of the cost of building said bridge or culvert of steel. Said officials shall not consider bids on any bridge or culvert made of concrete, reinforced concrete, or stone, which is not designed to safely carry a uniform live load of at least two hundred pounds per square foot of floor surface, nor on a bridge or culvert of seventy-five-foot span or less made of any other material except wood, which is not designed to safely carry a uniform live load of not less than one hundred pounds per square foot of floor surface; nor shall said officials consider bids upon a plan which is not designed with a smaller factor of safety than four; provided that every concrete, reinforced concrete, stone or steel bridge, with a concrete floor, shall be guaranteed by the contractor for a period of four years after the completion of said bridge against defects of design, workmanship or materials, said guarantee to be covered by an approved surety bond issued by a company authorized to do business in the state of Kansas." (Laws 1913, ch. 70. § 1.)

The plan and specifications filed with the county clerk for the inspection of bidders in this case comprise fifty-seven details, the second one of which reads:

"The accompanying plans, together with the accepted bids and these specifications, form the basis of the contract and are each to be considered a part thereof. The contract contemplates a structure complete in all its details. For such parts that are not shown with sufficient detail, the contractor shall submit detail drawings for such parts to the Board for approval before its incorporation in the work. After approval, such detail drawings shall become a part of the contract. Dimensions given must control in preference to scale measurements. When intermediate dimensions are desired the scales of similar adjacent parts shall control."

The specifications include first, what are known as "standard specifications," and define with particularity the materials of. which the bridge shall be constructed, the character of the stone and cement, the character of the steel used in the reinforcing members, the tension and stress of the same, the manner in which they shall be embedded and fixed in the concrete; and provide that all materials shall be subject to inspection and approval by the board who shall control as to interpretation. The plan accompanying the specifications consists of a blueprint which shows an elevation of one-half of the bridge, gives the center line, the different arcs of the arched rings with radii centers and degrees, together with details of appearance, including the ornamental features of the bridge and the coping and railing. It shows a cross-section of the roadway, giving a width of fourteen feet in the clear, and the depth and pitch of the earth fill. The blue print also gives the following details:

(a) The crossing and location of the bridge; (b) contour of the ground; (c) character of the soil, showing depth of rock or shale below the surface; (d) the depth in the rock or shale to which piers and abutments must be sunk; (e) the low water-line and the height of the archways above that line; (f) the locations of the abutments and piers; (g) the length in the clear of each span; (h) the curve of each arch ring; (i) the elevation of the roadway, and its pitch or camber with a datum line by which to construct the roadway; (j) the angle at which the wings are to be built showing the 'skew' at each end and proper elevations for each; (k) the position and elevation of an old stone ford to be removed by the contractor; and (l) a note is added stating that thickness of the arch rings, piers and abutments is to depend on details of reinforcing."

The principal omissions which the defendant considers material are, first, failing to give the thickness of the arch rings; second, failing to give the thickness of the pier; third, failing to give the dimensions of the abutments; fourth, failing to give the thickness of the wings. The plaintiff claims these objections are answered by the fact that the plan does give the length of the lower arcs and the width of the lower surfaces of these rings; and that as to the dimensions of the abutments, their height and width are given; and that as to the thickness of the wings, the specifications state their height, location, length, angles and "skews." The plaintiff further calls attention to the fact that a note on the blue-print states: "Thickness of arch rings, piers and abutments to depend on details of reinforcing," and contends that the meaning of this note is that the bulk or thickness of the arch rings, piers and abutments must be appropriate to the method used by the contractor in reinforcement. It is also contended by the plaintiff that all bidders were invited to compete as to methods of reinforcing and notified that any method of reinforcing that would correspond to the plans and specifications and produce the required structure would be considered by the county, and as all bidders were chargeable with notice of the requirements of the act of 1913, *supra*, as to the strength and factors of safety, each of them understood that whatever method of reinforcing he proposed, the arch rings, piers and abutments and the completed bridge must be adequate to meet the statutory requirements. It is urged that if the county had specified the thickness of the arch rings, piers and abutments, it would amount to the same thing as though the commissioners had adopted a single one of the several accepted methods of reinforcing and had excluded all the rest, and that while the county might have secured an equally good bridge, competition would necessarily have been restricted. Attention is called to a list of thirty patents issued to inventors of this type of bridge, the majority of which have been granted within the past ten or fifteen years, and it is stated in the brief that there have been many additional patents issued between April, 1911, and March 10, 1914, covering reinforced concrete arches.

One of the managing officers of the plaintiff testifies that the use of detail plans has resulted in limiting competition in bids

for reinforced concrete bridges, not only because of numerous patents covering various methods, but because a bridge of this character is a composite structure composed of steel and concrete combined, and any variation in detail of the amount or position of one of these materials changes the stresses and likewise the amount of the other material; that the majority of bridges built in this state since 1898 have been constructed of steel, that practically no concrete bridges were built before 1906, and that at this time there are not more than one-third of the bridges, exclusive of culverts, which are made of concrete; that the procedure for letting contracts for county bridges developed during the steel-bridge era, in which the practice has been to file a plan, specifications, and estimate of the cost, and that the plan so prepared and usually adopted determined the following points about the bridge: (1) Length of bridge; (2) width of the roadway; (3) height of bridge; (4) waterway; (5) depth of foundations; (6) general appearance; (7) angle the bridge makes with the stream; (8) general dimensions and locations of wing walls.

It is said the specifications usually determine: (1) The material of which the bridge shall be built; (2) the load the bridge shall safely carry; (3) the quantity of the different materials to be used; (4) standard specifications, which include rules and requirements common to specifications for the successful and satisfactory completion of the bridge and the protection of the county. He further testifies that after the contract is let, the practice has been for the contractor to file with the board his detailed working plans, which the board approved, with such modifications as it desired to have made; and that he has never known of a detailed working plan for a bridge to be placed on file for the inspection of bidders, either for highway or railroad work. His testimony is that with the plan and specifications determined upon by the board in this case—

"Any one skilled in reinforced arch construction will be able to fully determine just how the details can be arranged to build the bridge, and any one skilled in the art and employed by the board can determine whether the details the contractor submits to him will result in the bridge the board have previously determined upon. There is nothing to hinder any one skilled in the art from bidding on the general plans and the specifications submitted in this case. No two reinforced concrete arch

designers will make the details the same, yet both will produce the bridge the board determined upon in this case."

The plaintiff directs our attention to the fact that the art of building reinforced concrete bridges has developed a variety of methods, a great majority of which are protected by patents; that the quantity of steel used in such construction is relatively small, and that it is the constant object of inventors to reduce the quantity of concrete by scientifically reinforcing a smaller quantity thereof with steel or iron, and thus materially reduce the cost without sacrificing strength, durability, or appearance; that one contractor uses larger quantities of concrete and steel, while another, by using a different method of arranging the reinforcing members in the concrete, produces a bridge from a smaller amount of materials which is equally strong and durable and fully up to the statutory and proper engineering standards. It is said that one bidder may accomplish the result by making his arch rings thicker than another bidder would make them by using a different detail of reinforcement; and it is urged that there can be no valid objection against the board exercising their sound discretion, when, in asking for bids on a bridge of this character, they note on the plans filed for inspection that quantities of materials are to depend upon details of reinforcing, and thus invite competition from bidders using different methods of reinforcing, irrespective of patents protecting the various methods; and it is urged that if any person is entitled to construct such bridge, by using more than one patented method of reinforcement, he is at liberty to offer bids in the alternative covering various methods.

The affidavit of the state engineer is to the effect that where detailed working plans are not on file before the contract is made it is impossible for the engineer to make an estimate of the cost of construction, and, further, that the expense to each bidder of preparing a set of detail working plans for a bridge similar to the one in this case is about $150. He further testifies, in substance, that it is impossible to estimate or even to make an approximate guess as to the amount of concrete and steel that would be required for the construction of this bridge from the general plans and specifications, and that it would be impossible for a contractor to construct a bridge with

no more information than is furnished in the general plans and specifications, and that an engineer could not estimate the cost of the bridge; that detailed working drawings would have to be prepared showing the thickness of the concrete in each section of the arch ring, etc., and the sizes, spacing, exact location, and length of all reinforcing members before an estimate could be made. Also, that the detailed plans show a structure which is not designed according to the general plan or the advertisement; that the plans on file for the inspection of bidders indicate a vastly greater volume of concrete than is shown by the detailed plans. The necessary effect of this, if true, is to let every one but the favored bidder make his estimate upon the larger amount of concrete and consequently to bid higher than he would if he were bidding on the detailed plans.

The purpose of the statute requiring that contracts of this kind be let to the lowest bidder is to secure economy and to protect the public from collusive contracts which would result in favoritism and fraud. The intent of the requirement that a plan and specifications shall be on file for the inspection of bidders is that all bidders shall be placed on an equality, and that each shall know exactly what is required. We think it is clear that, although when these statutes were first adopted the construction of reinforced concrete bridges was an art unknown in this country, nevertheless the statute meant then just what it means now: that the plans and specifications on file for the inspection of bidders must, so far as the nature and character of the proposed work will admit, be sufficiently definite and explicit as to enable bidders to prepare their bids intelligently on a common basis. It may be said as a general rule that plans and specifications are sufficient if contractors and others skilled in such matters are able to determine what is required. (*Yaryan v. Toledo*, 28 Ohio C. C. 259, affirmed without opinion in 76 Ohio St. 584, 81 N. E. 1199.)

A discussion of the question of the sufficiency of specifications for guidance of bidders for public contracts will be found in a Note in 30 L. R. A., n. s., 214.

The authorities cited in the briefs of the parties furnish very little aid in determining whether or not the plans and specifications in the present case complied with the provisions

of the statute. The case most relied upon by the plaintiff is *Attorney General v. Detroit,* 26 Mich. 264, in which the opinion was written by the late Judge Cooley. Some of the language in the opinion in a general way seems to sustain the plaintiff's contention. For instance, it was said in the opinion:

"If they invite proposals for a particular thing or process, they necessarily in so doing exclude everything else which might have been substituted for the thing called for; and there is no clearer field for corruption and favoritism than in shaping proposals, if in fact the city is in corrupt hands." (p. 270.)

Again in the opinion it was said:

"If a patented article were desired, which was owned by a single person who refused to sell the right to territory, or to fix a royalty, or if stone or any other material were required, and a single person owned all within a practicable distance of the place where it was to be used, nothing could be more obvious than that proposals which confined bids to the particular article or material, would invite no valuable competition, and that the protection of the public must lie in the power of the council to reject unreasonable offers. In such a case nothing is easier than for the council to obey strictly the letter of the law, and yet dishonestly and corruptly award a contract to one who is lowest bidder for no other reason than because no one can bid against him, and who, having a practical monopoly, is allowed to fix his own terms." (p. 270.)

The foregoing language was applied, however, to a case wholly dissimilar to the present one. There the common council determined to pave a certain street, and "instead of determining in advance what particular kind of pavement should be put down, and confining their invitation for proposals to that kind" (p. 267), prepared and filed specifications for each of several different kinds of wood and stone pavement, and invited bids for the work to be done with either wood or stone pavements according to the specifications on file. Numerous competitive bids were received for putting down the various kinds of pavement, some covered by patents and others open. After the bids were in the council determined what pavement it would adopt, and let the contract to the lowest responsible bidder for that kind of pavement. We have no doubt that in this case the county might have adopted the course of inviting bids for a steel bridge, a stone bridge, and one of concrete, and if it had filed for the inspection of bidders plans and specifications for each of the three kinds, it might have determined after the bids were in which kind of bridge

Bridge & Iron Co. v. Labette County.

it would adopt and have let the contract to the lowest responsible bidder on that particular kind of a bridge. The following language of Judge Cooley in the Michigan case would apply to such a condition:

"When bids are thus called for, all bidders for a particular kind of pavement are bidders against all others, in a certain sense, but they are also bidders against each other in a more particular sense. It would be the duty of the council, when all bids were in, to examine all, and to select the kind of pavement for which the bids, all things considered, were relatively the lowest. They might thus, perhaps, reject the kind they would have preferred in advance, but for which they find all bids exorbitant, and determine upon another, because, in their opinion, the offers made for it are more satisfactory." (p. 272.)

In many of the cases cited by the defendant no plans and specifications whatever were filed, and of course it was held that the statute was violated. Thus, in *The People v. Commissioners of Buffalo County,* 4 Neb. 150, although the bridge was to cost $50,000, there were no plans and specifications prepared or filed in advance, and the only competitive bidding was on the plans and specifications of the bidders.

In *Mazet v. Pittsburgh,* 137 Pa. St. 548, 20 Atl. 693, certain general specifications were adopted which were applicable to all of certain streets to be paved. There were no specifications as to asphalt pavement, and bidders for that kind of pavement were directed to prepare their own specifications, which was accordingly done. The contract, however, was awarded to the defendant for what is called a "vulcanite" asphalt pavement, which the court in the opinion said was "a kind of pavement neither called for in the ordinance, nor even hinted at in the advertisement inviting bids." (p. 563.) The court held that the purpose of the statute and ordinances was to secure to the city the benefit and advantages of just competition between bidders and at the same time to prevent favoritism and fraud in every form, and that where there were no plans and specifications upon which to bid there could be no competitive bidding. This case is relied upon by the plaintiff, but it can hardly be said to apply to the facts here.

A case very frequently referred to, and which is cited and quoted from at length by the defendant, is *Fones Hardware Co. v. Erb,* 54 Ark. 645, 17 S. W. 7, 13 L. R. A. 353. There, the county commissioners following a statute authorizing them to

do so had adopted a general plan and detailed specifications. They then advertised for "sealed proposals, competitive plans and specifications." (p. 646.) The constitution of Arkansas contains a provision that all such contracts shall be given to the lowest responsible bidder. The court held that the general specifications were not sufficient and that it was essential that there be definite and detailed specifications, otherwise there could be no intelligent competitive bidding. The case differs from this, because here competitive plans and specifications were not expected to be filed with the sealed proposals, and it was not contemplated that any one except the successful bidder should prepare a detailed working plan after the contract was entered into.

None of the cases cited goes so far as to hold that statutes similar to ours can only be complied with by filing detailed working plans for the inspection of bidders. Nor have we been able by careful research to find any authorities that go to that extent or which are based upon facts at all similar to those in the present case. The authorities are practically unanimous in holding that there can be no active, intelligent competition among bidders unless plans and specifications are open to inspection which are sufficiently explicit as to afford to all bidders an equal opportunity to bid upon the same project or proposition.

The conclusions reached by a majority of the court are that the plans and specifications which the commissioners prepared in advance of the bidding are not a sufficient compliance with the statute, and that after the contract was awarded to the plaintiff it could not lawfully be changed by the substitution of additional specifications which made substantial changes in the requirements submitted to the other bidders. If the relative amount of concrete and steel to be used in the construction was not definitely known and understood by all bidders, but was to depend upon the design of the successful bidder and upon additional plans subsequently approved by the county board, all bidders could not be said to stand upon an equal basis, and, moreover, it would be impossible for the board to have had before it when bids were offered a correct estimate of the cost of the bridge. Wherever the plans and specifications on file for the inspection of bidders are, as in this case,

so general as to admit of any substantial variation of detail, then active, intelligent competition among bidders is prevented, and favoritism and corruption are made possible, and the purpose of the statute has not been complied with.

A further question remains for consideration. We are asked to determine whether section 673 of the General Statutes of 1909, which expressly provides that where the estimated cost of a bridge exceeds two thousand dollars, no appropriation shall be made until the question has been submitted at a general election, is still in force. This provision, which was a part of the Laws of 1879 (ch. 77, § 14), has been impliedly repealed by a recent act (Laws 1911, ch. 68), in which the legislature covered the entire subject in respect to the amounts and manner in which appropriations may be made for the building of county bridges, and classified counties according to population. The later act is general in its application, and every county in the state is placed in one or another of the various classes. In each class a county may, without an election, make an appropriation for building a bridge if the estimated cost shall not exceed a certain maximum, and when the cost does exceed that sum an election must be called. It was evidently the purpose to substitute the general law in place of all other laws on that subject. (*Topeka v. McCabe,* 79 Kan. 329, 331, 99 Pac. 602, and cases cited.)

It follows from what has been said that the contract for the construction of the bridge is void because of the failure to comply with the provisions of the statute, and therefore the writ is denied.

PORTER, J., and WEST, J., dissenting.