STATE OF NORTH CAROLINA v. ANTWAUN KYRAL SIMS

No. COA02-1262

(Filed 18 November 2003)

## 1. Evidence— rag with victim's blood and defendant's semen—knowledge—active participant in crime

The trial court did not abuse its discretion in a first-degree murder, first-degree kidnapping, and burning personal property case by admitting into evidence a rag found in the back seat area of the victim's Cadillac and the scientific analysis of that rag which concluded that the rag contained the victim's blood as well as traces of defendant's semen, because: (1) the evidence was not duplicative of the other evidence placing defendant in the Cadillac when it was used to show that defendant used the rag to wipe down the backseat of the car to wipe away the victim's blood, that defendant had knowledge of the kidnapping and helped cover it up, and that defendant was an active participant in the series of events; and (2) the evidence was not unfairly prejudicial when the trial court instructed the jury that the rag was not to be used as evidence of a sexual assault when there was no evidence of sexual assault.

## 2. Criminal Law— prosecutor's argument—rag contained victim's blood and traces of defendant's semen

The trial court did not abuse its discretion in a first-degree murder, first-degree kidnapping, and burning personal property case by failing to sustain defendant's objection to the State's reference during its opening and closing arguments to evidence of a rag found in the back seat area of the victim's Cadillac and the scientific analysis of that rag which concluded that the rag contained the victim's blood as well as traces of defendant's semen, because: (1) the State used the evidence only to argue that defendant knew the victim had been kidnapped and that he participated in the events; (2) the trial court instructed the jury not to consider the evidence of the presence of semen on the rag as evidence of sexual assault; and (3) the State referred to the rag merely in a factual manner during opening statements.

**3. Criminal Law— prosecutor's argument—comparing defend-
ant to an animal—acting in concert theory**

Although the trial court erred in a first-degree murder, first-
degree kidnapping, and burning personal property case by allow-
ing the State during closing arguments to improperly compare
defendant to a hyena and an animal of the African plain and to
state that "he who hunts with the pack is responsible for the kill"
when the reference went beyond a simple analogy to help explain
the theory of acting in concert, the improper statements did not
deny defendant due process and entitled him to a new trial
because: (1) the State did not misstate the evidence or the law in
making its argument; (2) the trial court instructed the jury that
closing arguments are not evidence; and (3) there was an abun-
dance of evidence, both physical and testimonial, that defendant
was guilty of the crimes charged.

**4. Criminal Law— prosecutor's argument—defendant a devil**

The trial court did not commit prejudical error in a first-
degree murder, first-degree kidnapping, and burning personal
property case by allowing the State to contend during closing
arguments that "if you are going to try the devil, you have to go to
hell to get your witnesses," because: (1) the Court of Appeals and
our Supreme Court have already concluded that almost exactly
this same statement was not reversible error; and (2) although in
some contexts such a statement by the prosecutor may be inap-
propriate, defendant is not entitled to a new trial given the over-
whelming evidence of defendant's guilt.

Judge WYNN concurring.

Appeal by defendant from judgments entered 24 August 2001 by
Judge Jay D. Hockenbury in Superior Court, Onslow County. Heard in
the Court of Appeals 19 August 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney
General A. Danielle Marquis, for the State.*

*Mary March Exum for defendant-appellant.*

McGEE, Judge.

Antwaun Kyral Sims (defendant) was convicted of first-degree
murder, first-degree kidnapping, and burning personal property on 24
August 2001. The trial court found defendant to have a prior record

level II for the latter two offenses. The trial court sentenced defendant to life imprisonment without parole for the first-degree murder conviction, to a minimum term of 100 months and a maximum term of 129 months imprisonment for first-degree kidnapping, and to a minimum term of eight months and a maximum term of ten months imprisonment for burning of personal property. Defendant appeals.

The State's evidence at trial tended to show that defendant was with Chad Williams (Williams) and Chris Bell (Bell) at the traffic circle in Newton Grove, North Carolina on 3 January 2000, when Bell said that the group needed to rob someone to get a car so Bell could leave the state to avoid a probation violation hearing. Defendant agreed to assist Bell. Defendant, Bell, and Williams observed Elleze Kennedy (Ms. Kennedy), an eighty-nine-year old woman, leaving the Hardee's restaurant across from the traffic circle around 7:00 p.m. Ms. Kennedy got into her Cadillac and drove to her home a few blocks away. Defendant, Bell, and Williams ran after Ms. Kennedy's car, cutting across several yards until they reached Ms. Kennedy's home. Bell approached Ms. Kennedy in her driveway with a BB pistol and demanded Ms. Kennedy's keys. Ms. Kennedy began yelling and Bell hit her in the face with the pistol, knocking her to the ground. Bell told defendant and Williams to help him find the keys to Ms. Kennedy's Cadillac. After rifling through Ms. Kennedy's pockets, Williams found the keys on the carport and handed them to defendant who agreed to drive.

Bell told defendant and Williams to move Ms. Kennedy to the back seat of the Cadillac. When defendant and Williams attempted to do so, Ms. Kennedy bit Williams on the hand. Williams hit Ms. Kennedy in the jaw, and with defendant's help, put her in the back seat. Ms. Kennedy kept asking Bell where he was taking her. Bell responded by telling her to shut up and striking her in the face several times with the pistol. Ms. Kennedy, who was now bleeding steadily, ceased struggling.

After driving to Bentonville Battleground, defendant, Bell, and Williams put Ms. Kennedy, who was unconscious at the time, in the trunk of the Cadillac. While driving around, Bell told defendant to turn up the radio so they could not hear Ms. Kennedy in the trunk. Defendant, Bell, and Williams drove to the Chicopee Trailer Park in Benson, North Carolina, arriving at Mark Snead's (Snead) trailer around 8:30 p.m. Defendant, Bell, and Williams told Snead that the Cadillac was a rental car and that the three of them were driving to Florida. Defendant, Bell, and Williams went inside Snead's trailer and

all smoked marijuana. Defendant, Bell, and Williams later drove to the other side of the trailer park to visit Pop and Giovanni Surles, also telling them that the Cadillac was a rental car.

While at the Chicopee Trailer Park, Williams told defendant and Bell that he was not going to travel in a stolen car to Florida with an abducted woman in the trunk. Williams got out of the Cadillac and began to walk back to Snead's trailer. Defendant and Bell drove away but later returned to Snead's trailer with the music in the Cadillac turned up very loud. Defendant and Bell told Williams that they had let Ms. Kennedy out of the trunk at a McDonald's and that Ms. Kennedy was now talking to the police. Williams then got back in the Cadillac and the three drove to defendant's brother's house. Defendant stated that he wanted to wipe up Ms. Kennedy's blood from the back seat of the Cadillac. Defendant went into his brother's house and returned with a damp rag, which he used to wipe down the backseat and backdoor where Ms. Kennedy had originally been held before she was placed in the trunk.

Defendant drove Williams and Bell to a nearby truck stop where Bell took four dollars from Ms. Kennedy's pocketbook, which he gave to defendant to buy gasoline for the Cadillac. Bell told defendant to leave the car running. Nevertheless, defendant turned the car off. While the car was turned off, Williams heard scuffling in the trunk and confronted defendant and Bell about Ms. Kennedy; however, defendant and Bell laughed, again saying they had dropped Ms. Kennedy off at McDonald's.

As they drove to Fayetteville, Bell threw the BB pistol and Ms. Kennedy's credit cards out of the window of the Cadillac. Defendant, Bell, and Kennedy parked at a motel and were opening the trunk to let Ms. Kennedy out when a police car drove by. They closed the trunk, got back in the Cadillac, and drove to a nearby housing project where defendant and Bell reopened the trunk. Williams testified that it appeared Ms. Kennedy attempted to get out of the trunk but that defendant slammed the trunk back down.

Defendant, Bell, and Williams decided to return to Newton Grove to find the scope from the BB pistol which was lost during the abduction of Ms. Kennedy. Upon arriving at Ms. Kennedy's home, Williams observed blood on the concrete slab, as well as a pair of glasses and a woman's shoe. Bell searched Ms. Kennedy's yard for the scope but did not find it; he picked up the woman's shoe and put it in the Cadillac.

While discussing what to do with Ms. Kennedy, Bell told Williams that he knew a place to put her, but that defendant knew of an even better place. Defendant, Bell, and Williams drove to a field with some trees, located near defendant's brother's house. The three opened the trunk and Williams saw Ms. Kennedy moving around in the trunk and moaning. Williams asked if they could let her go, but Bell replied, "Man, I ain't trying to leave no witnesses. This lady done seen my face. I ain't trying to leave no witnesses." Bell asked defendant for a lighter to burn Bell's blood-covered jacket. Defendant gave Bell his lighter and Bell set the jacket on fire and threw it into the Cadillac. Bell stayed to watch the fire, but defendant and Williams walked back to defendant's brother's house to watch television. When Bell returned to the house, he first joked that he had let Ms. Kennedy out of the car and that she had driven the Cadillac away; however, he informed defendant and Williams that he had actually just stayed to watch the jacket burn. The three slept at defendant's brother's house. The next morning Bell told defendant to go back to the car and confirm that Ms. Kennedy was dead, and that if she was not, defendant should finish burning the Cadillac. Defendant returned and told Bell and Williams that Ms. Kennedy was dead and that all of the windows in the Cadillac were smoked. Bell did not believe defendant and called Ryan Simmons (Simmons) to come and drive them to the Cadillac. Defendant and Bell wiped the car down to remove any fingerprints, and Williams, responding to an inquiry from Simmons, confirmed the Cadillac was indeed stolen.

Simmons drove defendant, Bell, and Williams to Bell's house for a change of clothes and a few video games, and then drove the three back to defendant's brother's house. Simmons came back to pick up Bell and Williams a couple of days later; however, before leaving, Bell told Williams and defendant to lie if the police questioned them about the murder.

Ms. Kennedy's Cadillac was found by law enforcement the morning after her abduction. Investigators discovered Ms. Kennedy's body in the trunk. They made castings of footprints found in the area of the abandoned Cadillac. The castings were later compared to, and matched, shoes taken from defendant. Investigators identified fibers consistent with Ms. Kennedy's clothing on clothes seized from Williams, and identified Ms. Kennedy's blood on clothes worn by Williams and Bell and on Bell's burned jacket. Investigators recovered a red cloth from the backseat floorboard, which was later identified as the one defendant had used to wipe down the back

seat of the Cadillac. Tests of the cloth showed traces of defendant's semen and Ms. Kennedy's blood. Police found two hairs in the backseat area of the Cadillac, one of which was later determined to be defendant's and the other Bell's. Police also matched latent fingerprints found on the Cadillac with prints taken from defendant and Bell.

The police concluded that the fire was set intentionally and burned the rear of the front seats and the armrest before it extinguished from a lack of oxygen, leaving soot inside the passenger compartment as well as in the trunk.

Upon investigating the area outside Ms. Kennedy's residence, investigators discovered a large puddle of blood in the driveway, a pair of eyeglasses, a dental partial, a blue button, a walking cane, a partial shoe impression, and blood smear marks on the driveway consistent with a dragging motion.

Forensic pathologist Dr. Falpy Carl Barr (Dr. Barr) testified that he conducted Ms. Kennedy's autopsy on 5 January 2000. Dr. Barr noted blunt force injuries to Ms. Kennedy's face, including an injury to the bridge of her nose, fractures of the small bones on either side of her nose, as well as abrasions above each eyebrow, bruises to her face, neck, and chest area, and injuries to her hands. Dr. Barr testified that Ms. Kennedy was struck multiple times with a weapon, leaving marks consistent with a pellet gun, and that the other bruising to her torso could have been the result of having been kicked. Dr. Barr also testified that Ms. Kennedy's dental bridge was missing and that several teeth were loose. Dr. Barr testified that there was no evidence of sexual assault of Ms. Kennedy. Dr. Barr testified that because of the extent of soot in her trachea and lungs he believed that she was alive and breathing at the time the fire took place in the vehicle; however, because of Ms. Kennedy's elevated carbon monoxide level, Dr. Barr came to the conclusion that Ms. Kennedy died as a result of carbon monoxide poisoning from a fire in the Cadillac.

Williams lied to the police about his involvement, and he claimed that defendant was not present at the initial attack on Ms. Kennedy; however, Williams ultimately confessed to his involvement and inculpated defendant and Bell. Williams pled guilty to first-degree murder, first-degree kidnapping, and assault with a deadly weapon inflicting serious injury. Williams testified at defendant's trial and was awaiting a capital sentencing hearing at the time.

Defendant presented testimony from several alibi witnesses who said defendant was at the Chicopee Trailer Park all day until dark on 3 January 2000. Dwayne Ricks testified that he gave defendant a ride to the Chicopee Trailer Park on the morning of 3 January 2000. Giovanni Surles testified that he spent the day with defendant at the Chicopee Trailer Park. Bessie Surles testified she saw defendant with Giovanni Surles at the trailer park into the evening. Brenda Surles testified that she saw her son, Giovanni Surles, walking with defendant in the early afternoon and again in the early evening. Yolanda Peacock testified that she left the Chicopee Trailer Park at dark to go to the store to buy cigars for defendant, but that when she returned around 7:00 p.m. defendant was no longer there. Latisha Williams testified she saw defendant at the Chicopee Trailer Park in the afternoon, but that defendant left as it was getting dark. Latisha Williams further testified that Bell and Williams arrived in a Cadillac looking for defendant, and that when she saw the Cadillac again, defendant was in the Cadillac with Bell and Williams. Several of these alibi witnesses also testified that Bell and Williams arrived at the trailer park later in the evening driving a Cadillac and that defendant left with Bell and Williams in the Cadillac. Brenda Surles also testified that it takes about twenty-five to thirty minutes to drive from the Chicopee Trailer Park to the Newton Grove traffic circle.

Defendant also presented testimony of Antowean Darden (Darden) that Bell had approached Darden about renting a car, but Darden denied that he had seen defendant, Bell, or Williams at the Newton Grove traffic circle on the night of 3 January 2000. On cross-examination, Darden admitted that he named defendant, Bell, and Williams as possible suspects in the murder at a law enforcement roadblock on 4 January 2000. Defendant's girlfriend, Krystal Elliot, testified that Williams had called her from jail to tell her that defendant was not with Williams and Bell when they abducted Ms. Kennedy from her home.

Defendant has failed to put forth an argument in support of assignments of error one through six and twelve through twenty-two; pursuant to N.C.R. App. P. 28(b)(6) we deem those assignments of error to be abandoned.

I.

[1] Defendant challenges the admission into evidence of a rag found in the back seat area of the Cadillac and the scientific analysis of this rag, which concluded that the rag contained Ms. Kennedy's blood as

well as traces of defendant's semen. Defendant also contends that reference in the State's opening and closing arguments to the rag and to the traces of defendant's semen on the rag was error.

Defendant objected at trial to the admission of the rag and its scientific analysis, arguing that under N.C. Gen. Stat. § 8C-1, Rule 403, the probative value of the evidence was substantially outweighed by its prejudicial effect, by its possibility to mislead the jury, and by the cumulativeness of the evidence. Whether to exclude relevant evidence under N.C.G.S. § 8C-1, Rule 403 is in the trial court's discretion; we review the trial court's decision for an abuse of that discretion. *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Hayes*, 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985).

Defendant argues that the rag and the analysis indicating the presence of defendant's semen and Ms. Kennedy's blood on the rag were duplicative evidence of defendant's presence in the Cadillac. Defendant contends the probative value of the evidence was minimal because there was testimony by Williams that defendant was in the Cadillac, as well as physical evidence of defendant's fingerprints on the outside of the Cadillac, a head hair from defendant found in the Cadillac, and castings of defendant's footprints found around the Cadillac. We disagree.

Defendant's theory at trial was that although he was in the Cadillac, he joined Bell and Williams only after Ms. Kennedy had been kidnapped, that he was unaware of her kidnapping, and that he simply went along for the ride. Defendant's hair and fingerprints were found in the Cadillac and he stipulated that he was in the vehicle. This evidence is consistent with both defendant's theory that he just went along for the ride and with the State's theory that defendant actively participated. However, Williams' testimony indicated that defendant was an active participant in the events. Defendant attempted to discredit Williams' testimony. Williams testified that defendant went into defendant's brother's house and returned with a damp rag to wipe down the back seat because Ms. Kennedy's blood was on the seat. The fact that a rag, covered with Ms. Kennedy's blood, was found in the Cadillac is evidence that the seat was indeed wiped down with a rag. The traces of defendant's semen on the rag further corroborate Williams' testimony, because defendant's DNA in his semen tends to identify defendant as the person who obtained and used the rag to

wipe away Ms. Kennedy's blood. Defendant's use of the rag to wipe down the backseat also tends to show defendant had knowledge of the kidnapping and, by helping to cover up the kidnapping, he was an active participant in the series of events. Thus we find there was indeed probative value to the evidence, and that it was not simply duplicative of the other evidence placing defendant in the Cadillac.

Defendant also argues that despite any probative value the evidence may have had, it was substantially outweighed by the prejudice it created because of the inference that a sexual assault of Ms. Kennedy may have occurred due to the presence of semen on the rag. However, as the trial court stated several times, there was no evidence of sexual assault in the record, and the trial court instructed the jury that the rag was not to be used as evidence of a sexual assault given the fact that there was no other evidence that any such sexual assault occurred. Despite the fact that the State, out of the presence of the jury, contested the trial court's admonishment not to argue that the rag was evidence of a sexual assault, the State never made any such argument to the jury. We find that in the present case the probative value of the rag and the scientific analysis of the rag was not substantially outweighed by the danger of undue prejudice or misleading the jury. The trial court did not err in exercising its discretion in admitting the rag and the scientific analysis of the rag, which indicated the presence of defendant's semen.

[2] Defendant also cites as error the trial court's failure to sustain defendant's objection to the State's use of, in its closing argument, the evidence of the rag and the scientific analysis of the rag revealing the presence of defendant's semen and Ms. Kennedy's blood. "The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection." *State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). In order to show an abuse of discretion, defendant must show that the trial court's failure to sustain defendant's objection " 'could not have been the result of a reasoned decision.' " *Id.* (quoting *State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996)). " 'Trial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom.' " *State v. Hyde*, 352 N.C. 37, 56, 530 S.E.2d 281, 294 (2000), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d. 775 (2001) (quoting *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999)).

As discussed above, the rag and the scientific analysis of the rag were properly admitted into evidence. The State used this evidence in its closing argument to argue only that defendant knew Ms. Kennedy had been kidnapped and that he participated in the events. Additionally, as discussed above, the trial court instructed the jury not to consider the evidence of the presence of semen on the rag as evidence of sexual assault. The trial court did not abuse its discretion by allowing the State in its closing argument to comment on the rag and the scientific analysis of the rag, including the presence of defendant's semen.

Defendant also challenges the trial court's failure to sustain defendant's objection to the mention of the semen in the State's opening statement. The district attorney, in the pertinent portion of the State's opening statement, said as follows:

The evidence will show, members of the jury, that at least five types of evidence will prove that [defendant] and Bell were, in fact, in Ms. Kennedy's car. Number one, you will have fingerprints; two, foot tracks; three, hair; four, you will have blood evidence; five, semen.

Defendant objected to this statement and the trial court overruled the objection. The district attorney continued, "DNA evidence will prove the red washcloth—found in the backseat of Ms. Kennedy's car had [defendant's] semen on it," to which defendant objected and was overruled.

Defendant has not shown how it was error to allow the State to make these statements concerning the rag and the semen found on the rag in its opening statement. Defendant argues that the State promised not to mention the rag in its opening statement; however, the transcript reveals this contention to be incorrect. The State simply stated that as to the rag, the State would refer to it as a factual matter, not in an argumentative fashion, in its opening statement. Since the evidence of the rag and the scientific analysis of the rag was properly admitted by the trial court, it was not improper for the State to refer to the rag in a factual manner as it did during its opening statement. The trial court did not err in overruling defendant's objections to the mention of the rag in the State's opening statement. We overrule defendant's first argument.

## II.

[3] Defendant assigns error to the following portion of the State's closing argument:

He who hunts with the pack is responsible for the kill. Each of you have seen those nature shows: Discovery Channel, Animal Planet. You've seen where a pack of wild dogs or hyenas in a group attack a herd of wildebeests, and they do it as a group.

When they take that wildebeest, one of them might be the one that chases after it and grabs the leg of the wildebeest, slows them down. Another one might be out fending off the wildebeests that are coming and making their counterattacks. You have another that will be the one that actually grasps its jaws about the throat of the wildebeest, ultimately, crushing the throat and taking the very life out of that animal.

He who hunts with the pack is responsible for the kill. Each and every one of those animals are responsible for that kill. Each and every one of those animals will feast on the spoils of that kill. He who hunts with the pack is responsible for the kill.

Just like the predators of the African plane [sic], Chad Williams, [defendant], and Christopher Bell stalked their prey. They chased after their prey. They attacked their prey. Ultimately, they fell their prey.

Just like the predators of the African—

At that point in the State's closing argument defendant objected and asked to approach the bench. After discussion outside the presence of the jury, the trial court overruled defendant's objection that the State was referring to defendant as a hyena and an animal of the African plain; however, the trial court admonished the State to be very careful not to refer to defendant as an animal or to make any such inference. The State then continued its closing argument:

Just like the animals in the African plane [sic], after having felled their victim, they dragged their victim away; and, finally, they killed their victim.

. . .

You know, in the wild kingdom, there is always an animal, just like human beings—think about it. You get a group of people together; there is always one person that makes the decision. We're going to go to this place. This is the one that decides what to do. You have the leader. . . .

The same way in the animal world. Its called the alpha male, the dominant male. You all know that. You've seen that.

Chad Williams was not the alpha male. Chad Williams was not and is not the dominant male. Do you know what? It doesn't matter. When you run with the pack, you are responsible for the kill.

[Defendant] ran with the pack. He acted in concert with Christopher Bell and Chad Williams; and as a result, he . . . is guilty of these crimes.

The State argues that the use of the phrase, "he who hunts with the pack is responsible for the kill," is a long accepted explanation of the theory of acting in concert. The State cites *State v. Knotts*, 168 N.C. 173, 187, 83 S.E. 972, 979 (1914), where our Supreme Court used the phrase to help illustrate just such a legal theory. Then, in *State v. Lee*, our Supreme Court again addressed the use of this phraseology stating,

[t]he isolated phraseology "[h]e who hunts with the pack is responsible for the kill," objected to by defendant, was intended as an illustrative statement of the law of conspiracy. It is highly unlikely that the statement was considered by the jury as anything other than an illustration of the law. When considered in the context in which it was used it had no prejudicial effect on the result of the trial and was therefore harmless.

*Lee*, 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970).

In *State v. Cogdell*, 74 N.C. App. 647, 652, 329 S.E.2d 675, 678-79 (1985), this Court confronted the same language in the context of jury instructions. This Court held, basing our decision on *Lee*, 277 N.C. 205, 176 S.E.2d 765, that the defendant's counsel in that case did not act in an incompetent manner by failing to object to the phrase included in the jury instructions; and further held, with little discussion, that it was not reversible error for the trial court to give such an instruction. *Cogdell*, 74 N.C. App. at 652, 329 S.E.2d at 678-79.

As discussed above, in isolation the statement, "he who hunts with the pack is responsible for the kill," has been held not to be reversible error. Further, in at least one case, our Supreme Court has used almost identical language as an explanation for the theory of acting in concert. *Knotts*, 168 N.C. at 187, 83 S.E. at 979. However, the district attorney in the present case went beyond simply making an isolated statement using the "he who hunts with the pack" analogy. In

the present case, although the district attorney did not specifically call defendant, Williams, and Bell "wild dogs or hyenas" hunting on the "African plain," the association was sufficiently close to lead to such an inference. This is especially true, given the fact that defendant is African-American, and in light of multiple references to hunting on the "African plain," even after the trial court warned the district attorney to be careful in his references. The district attorney's further references to Bell as the "alpha male" and his references to defendant and Williams as followers in the pack, continued this close association with the animal kingdom, moving beyond a simple analogy to help explain the theory of acting in concert.

In the present case, we find these arguments by the district attorney to be improper. However, in order for defendant to be entitled to a new trial, the district attorney's statements must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *State v. McCollum*, 334 N.C. 208, 223-24, 433 S.E.2d 144, 152 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986)). In *McCollum*, our Supreme Court found that improper statements made during the State's closing arguments did not deny the defendant due process, stating:

> The prosecutor's arguments here did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused such as the right to counsel or the right to remain silent. The trial court instructed the jurors that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. Moreover, the weight of the evidence against the defendant . . . submitted to the jury was heavy . . . . All of these factors reduced the likelihood that the jury's decision was influenced by these portions of the prosecutor's closing argument. Therefore, the prosecutor's closing argument did not deny the defendant due process.

*McCollum*, 334 N.C. at 224-25, 433 S.E.2d at 152-53. This analysis is similarly applicable to the present case. The State did not misstate the evidence or the law in making its argument. The trial court similarly instructed the jury that closing arguments are not evidence. In addition, there was an abundance of evidence, both physical and testimonial, that defendant was guilty of the crimes charged. We find that, although improper, the district attorney's comments did not deny defendant due process entitling him to a new trial. This assignment of error is overruled.

STATE v. SIMS

[161 N.C. App. 183 (2003)]

### III.

**[4]** Defendant also assigns error to the district attorney's statement during closing argument that, "If you are going to try the devil, you have to go to hell to get your witnesses." This assignment of error is without merit. Our Supreme Court, as well as this Court, have held that practically the same exact statement made during the State's closing argument was not reversible error. *See State v. Sidden,* 347 N.C. 218, 229, 491 S.E.2d 225, 230 (1997), *cert. denied,* 523 U.S. 1097, 140 L. Ed. 2d 797 (1998) (noting that, even though the prosecutor in effect said the defendant qualified as the devil, because of the context of the statement, "the jury could [not] have thought the prosecutor believed the defendant was the devil" but that he was simply a "bad man"); *State v. Willis,* 332 N.C. 151, 171, 420 S.E.2d 158, 167 (1992) (noting that "the district attorney was [not] characterizing [the defendant] as the devil," but merely "used this phrase to illustrate the type of witnesses which were available in a case such as this one"); *State v. Hudson,* 295 N.C. 427, 435-37, 245 S.E.2d 686, 692 (1978) (noting the prosecutor's argument which included a similar statement, was "within the recognized bounds of propriety"); *State v. Joyce,* 104 N.C. App. 558, 573-74, 410 S.E.2d 516, 525 (1991), *cert. denied,* 331 N.C. 120, 414 S.E.2d 764 (1992) (noting this phraseology has been held not to constitute prejudicial error); *State v. Rozier,* 69 N.C. App. 38, 58, 316 S.E.2d 893, 906, *cert. denied,* 312 N.C. 88, 321 S.E.2d 907 (1984) ("Taken in context, the prosecutor's metaphor falls short of the direct name-calling, or vituperative hyperbole, which has been found to be reversible error in other cases.") (citations omitted). Despite the fact that in some contexts such a statement by a district attorney may be inappropriate, given the overwhelming evidence of defendant's guilt, defendant has not shown how the district attorney's statement constituted prejudicial error meriting a new trial. This assignment of error is overruled.

No error in part; no prejudicial error in part.

Judge HUDSON concurs.

Judge WYNN concurs with a separate opinion.

WYNN, Judge concurring.

I agree with the majority's holding that no prejudicial error occurred in the proceedings below; however, I write separately

because I believe the trial court abused its discretion in admitting evidence regarding the presence of semen on a rag.

Under N.C. Gen. Stat. § 8C-1, Rule 403, Defendant objected to the admittance of any evidence regarding the semen and its DNA analysis and to the mentioning of said evidence in the opening and closing statements. Rule 403 allows discretionary exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Defendant contends the probative value of the rag and the analysis indicating the presence of Defendant's semen was minimal, was substantially outweighed by unfair prejudice, and constituted duplicative evidence of his presence in the car. The majority opinion holds that even though Defendant stipulated to his presence in the vehicle, the presence of semen on the rag tended to indicate that Defendant was the person who used the rag to wipe down the backseat and was therefore an active participant in the kidnapping and murder. Therefore, according to the majority, the admittance of this evidence was not an abuse of discretion. I respectfully disagree.

The pertinent facts indicate Christopher Bell, Chad Williams, and Defendant kidnapped Ms. Kennedy, stole her car, drove the car to a place designated by Bell, caused Ms. Kennedy to bleed by pistol-whipping her, and placed her in the trunk. Sometime thereafter, the State's evidence also tended to show Defendant drove to his brother's home, obtained a rag, and wiped Ms. Kennedy's blood from the back seat.

Scientific analysis revealed the rag contained Ms. Kennedy's blood and semen belonging to either Defendant or Defendant's brother, who was not a party to this crime. The tests did not indicate how long the semen had been present on the rag. No evidence of semen was located on Ms. Kennedy's clothing or her person and there was no evidence of a sexual assault.

The State argued that the presence of Defendant's semen on the rag indicated Defendant wiped up the blood and was therefore an active participant in the kidnapping and murder. However, under these facts, the presentation of any semen evidence was unnecessary as there was more than sufficient evidence of Defendant's presence and active participation in this crime. Indeed, Defendant stipulated to

his presence in the car. Moreover, other evidence indicates that Defendant drove the car, chose the abandonment location near his brother's home, obtained the rag used to wipe up the blood, and returned to the scene of the crime in order to cover up his finger-prints. The evidence also indicates the three men spent the night of the kidnapping and murder and several days thereafter at Defendant's brother's home. The day after the murder, the three men returned to the abandoned car in order to cover up any evidence of their crime. Under the facts of this case, the probative value of the semen evidence was minimal.

On the other hand, the prejudicial effect of the semen evidence was significant. The presence of semen on the rag indicates sexual activity occurred at some point. However, when such activity, by whom such activity, and with whom such activity occurred is uncertain. No semen was found on Ms. Kennedy's person or clothing and there was no other evidence of sexual assault. The rag belonged to Defendant's brother and was obtained from Defendant's brother's home. The DNA analysis could not exclude Defendant's brother as the source of the semen and the analysis could not indicate how long the semen had been present on the rag. Nevertheless, the State argued several times to the Court that the jury should be allowed to infer the men kidnapped Ms. Kennedy for the purpose of sexual gratification. In the absence of any evidence of sexual assault and given the overwhelming evidence of Defendant's presence in the car and active participation in this crime, the probative value of the semen evidence was substantially outweighed by unfair prejudice and constituted duplicative evidence. Accordingly, I conclude the trial court abused its discretion in admitting the semen evidence and allowing the State to mention said evidence in its opening and closing arguments.

However, the overwhelming evidence of Defendant's presence in the car and active participation in the crime renders the trial court's abuse of discretion non-prejudicial. *See State v. Patterson*, 103 N.C. App. 195, 205-06, 405 S.E.2d 200, 207 (1991) (stating that "under G.S. 15A-1443(a) a defendant must demonstrate that there is a reasonable possibility that had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises). Moreover, the trial court gave a curative instruction limiting jury consideration of the evidence to that of identification of the perpetrator and corroboration of the State's evidence and specifically prohibited the use of such evidence as proof of sexual assault

STATE EX REL. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[161 N.C. App. 199 (2003)]

of the victim. Accordingly, I would hold the trial court committed non-prejudicial error.